DECISION AND JOURNAL ENTRY
This cause was heard upon the record in the trial court. Each error assigned has been reviewed and the following disposition is made:
 {¶ 1} Appellant, Latasha Humphries, appeals from her conviction in the Stark County Court of Common Pleas. This Court affirms.
 I. {¶ 2} On December 19, 2005, Appellant, Latasha Humphries, was indicted on one count of child endangerment, in violation of R.C.2919.22(A)(E)(2)(c), a felony of the third degree. The indictment arose out of the death of Humphries' three-year-old daughter, "K.H.", on December 14, 2002. Humphries pleaded not guilty and her case proceeded to trial before a jury on May 15, 2006. The State presented several witnesses including three physicians and the coroner who performed an autopsy on K.H. The physicians testified that *Page 2 
K.H. died as a result of an acute onset subdural hematoma caused by shaken baby syndrome. Dr. Paul Byrne testified for the defense. Dr. Byrne opined that K.H. died of chronic subdural hematoma, the continual leakage of a blood vessel in the head, not shaken baby syndrome. The jury convicted Humphries of child endangerment and she was sentenced to five years incarceration. Humphries timely appealed her conviction, raising three assignments of error for our review.
 II. ASSIGNMENT OF ERROR I "[HUMPHRIES'] CONVICTION WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE."
 {¶ 3} In her first assignment of error, Humphries contends that her conviction for child endangerment was against the manifest weight of the evidence. We disagree.
 {¶ 4} "While the test for sufficiency requires a determination of whether the state has met its burden of production at trial, a manifest weight challenge questions whether the state has met its burden of persuasion." State v. Gulley (Mar. 15, 2000), 9th Dist. No. 19600, at *1, citing State v. Thompkins (1997), 78 Ohio St.3d 380, 390 (Cook, J. concurring). When a defendant asserts that his conviction is against the manifest weight of the evidence,
 "an appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." State v. Otten (1986), 33 Ohio App.3d 339, 340.
 {¶ 5} This discretionary power should be invoked only in extraordinary circumstances when the evidence presented weighs heavily in favor of the defendant. Id. A weight of the evidence challenge indicates that a greater amount of credible evidence supports one side of the issue than it supports the other. Thompkins, 78 Ohio St.3d at 387 (overruled on other grounds). Further, when reversing a conviction on the basis that the conviction was against the manifest weight of the evidence, the appellate court sits as the "`thirteenth juror'" and disagrees with the factfinder's resolution of the conflicting testimony. Id. at 388, quoting Tibbs v. Florida (1982), 457 U.S. 31, 42. Therefore, this Court's "discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction." State v. Martin (1983), 20 Ohio App.3d 172,175. See, also, Otten, 33 Ohio App.3d at 340. *Page 3 
 {¶ 6} The jury convicted Humphries of child endangerment, in violation of R.C. 2919.22(A), which provides, in pertinent part, that
 "No person, who is the parent, guardian, custodian, person having custody or control, or person in loco parentis of a child under eighteen years of age or a mentally or physically handicapped child under twenty-one years of age, shall create a substantial risk to the health or safety of the child, by violating a duty of care, protection, or support."
 {¶ 7} Pursuant to R.C. 2919.22(E)(2)(c), if the crime of endangering children results in serious physical harm to the child, then the crime constitutes a felony of the third degree. To find that a child has suffered serious physical harm, the fact finder must find that the child has experienced one of the following:
 "(a) Any mental illness or condition of such gravity as would normally require hospitalization or prolonged psychiatric treatment;
 "(b) Any physical harm that carries a substantial risk of death;
 "(c) Any physical harm that involves some permanent incapacity, whether partial or total, or that involves some temporary, substantial incapacity;
 "(d) Any physical harm that involves some permanent disfigurement or that involves some temporary, serious disfigurement;
 "(e) Any physical harm that involves acute pain of such duration as to result in substantial suffering or that involves any degree of prolonged or intractable pain." R.C. 2901.01(A)(5).
 {¶ 8} At trial, the State presented nine witnesses, including three physicians, Humphries' former boyfriend, Robert Vann, and the coroner who performed the autopsy on K.H.
 {¶ 9} Robert Vann testified regarding the events surrounding K.H.'s death. According to Vann, on December 12 and 13, 2002, he was residing with Humphries and her three children in Canton, Ohio. Vann continued a romantic relationship with Humphries until a few years after K.H.'s death. He and Humphries had three children together who were all born after K.H.'s death.
 {¶ 10} On the night of December 12, 2002, Vann was at Humphries' house playing on the computer and smoking marijuana with one of his friends. He testified that Humphries also smoked marijuana that evening. Humphries' three children were upstairs while the three adults smoked marijuana. After smoking a few "blunts", Vann left the house for about an hour. When he returned *Page 4 
home, he did not see the children. Humphries was in the living room when he returned. Vann testified that K.H. and Humphries' eldest daughter shared a room and that Humphries' son slept in his own room. He stated that the kids generally put themselves to bed without adult supervision. Vann testified that K.H. wore a pink nightgown adorned with cartoon characters to bed that night. After the kids went to bed, Vann and Humphries watched a movie. None of the children came downstairs while he and Humphries watched the movie. He testified that he and Humphries slept on the couch that night. Vann further stated that he did not recall that Humphries went upstairs to check on the children at any point after they went to bed.
 {¶ 11} When he awoke, the two eldest children were preparing for school. Vann could not remember where Humphries was when he awoke. He testified that he did not see K.H. when he saw the other two children leave for school. He did not go upstairs that morning. After the other two children left for school, Humphries prepared to go to her mother's house. He could not recall whether she went upstairs at any point.
 {¶ 12} When Humphries left, Vann assumed that K.H. was still asleep upstairs. Vann testified that he heard a strange noise upstairs. He assumed that the sound was caused by one of their cats. When he walked upstairs to investigate, he discovered K.H. lying on the floor. Vann testified that K.H. was wearing a blue jumper with footies. He stated that this was a different outfit than the one he saw her in the night before. He yelled to her to get up but she did not respond. Vann attempted to resuscitate her by way of CPR. Vann testified that K.H. did not make any noises while he administered CPR. He did not see any blood, cuts or bruises on her. When she failed to respond, he went to the neighbors' houses to find a phone so that he could call 911. He explained that there was no phone in the house. After the 911 call was placed, Vann went back to the house. The paramedics arrived and he spoke with them about K.H.
 {¶ 13} Vann walked to Humphries' mother's house to alert her about K.H. He testified that Humphries did not seem surprised to see him. Vann, Humphries and her mother returned to the house. The paramedics were still at the house when they arrived. The paramedics transported K.H. to the hospital. Vann testified that he recalled that he and Humphries rode to the hospital with Humphries' mother.
 {¶ 14} Vann testified that he did not physically hurt K.H. More specifically, he testified that he did not ever "violently shake" K.H. He testified that Humphries has not admitted to him that she harmed K.H. He stated that he did not know who could have harmed K.H.
 {¶ 15} Humphries' eldest daughter, L.B., testified for the State. L.B. was nine years old at the time of her sister's death. At the time of trial, L.B. was 13 years old. She recalled that on December 12, 2002, her mom came upstairs with *Page 5 
her when she went to bed. She testified that she dressed K.H. in her pajamas which were white footie pajamas with Minnie Mouse stamped all over them. She stated that the pajamas were also blue, pink and black. The State introduced a pair of pajamas into evidence which resembled the pajamas L.B. described. L.B. testified that these were the pajamas K.H. wore to bed that night. L.B. put K.H. to bed that night. L.B. stated that the crib K.H. slept in had four sides which "were up." She stated that K.H. would wake her or her mom up to help her out of the crib. She did not recall that K.H. cried during that night. She also did not remember anyone coming into the room that night. When L.B. awoke in the morning, K.H. remained in bed. L.B. said "good morning" to K.H., dressed, washed, ate and left for school. She recalled that K.H. did not respond when she said "good morning" to her. When she woke up, one of the sides of the crib was down. She testified that K.H. had on a different set of pajamas which were pink or blue. Before L.B. left for school, she awoke her mom. L.B. testified that she did not hurt K.H. and that she did not know who had hurt her.
 {¶ 16} Jay Fisher, a Canton fireman, testified regarding his response to Humphries' home on December 13, 2002. Fisher testified that he received the call at 10 or 11 in the morning. He stated that when he arrived, he was directed upstairs to K.H.'s bedroom. A woman was standing in the room with K.H. Fisher testified that K.H. was unresponsive although she had a pulse and was breathing. He picked her up, carried her downstairs and handed her to an ambulance crewmember that had just arrived. Fisher explained that when he found K.H., she was lying on the floor on her back about a foot from the bed. He stated that she was lying closer to the bed than to the crib. Fisher testified that K.H. was wearing pink footed pajamas. He recalled that the crib had three sides. He testified that the side facing the room was down and it appeared that it was missing altogether.
 {¶ 17} Rick Leone, a Canton fireman and paramedic, testified for the State. Leone testified that he was working as a paramedic on December 13, 2002 and that he had responded to Humphries' house. Leone transported K.H. to Aultman Hospital. When he loaded her into the ambulance, she was unconscious. According to Leone, she did not regain consciousness during the ambulance ride. He testified that she was wearing dingy one piece pajamas. Leone had to cut the pajamas off of K.H. because they were so tight. He also removed a soiled pull-up style diaper that she was wearing. He handed K.H.'s pajamas to the emergency room personnel when they arrived at the hospital.
 {¶ 18} C.J. Cross, an investigatory social worker with the Department of Job and Family Services for Stark County, also testified for the State. Cross' job entails investigating child fatalities, sex crimes, and abused children. Cross began investigating K.H.'s condition on December 13, 2002, after receiving a call that a child with a possible head trauma injury was being flown from Aultman to Akron Children's Hospital. The case was assigned to Cross, who was already at *Page 6 
Akron Children's Hospital that day investigating another case. He met with Humphries in the trauma unit at approximately 12:20 p.m. He testified that Humphries was initially very calm. He reiterated the story Humphries relayed to him during their initial conversation. Cross testified that Humphries told him that she and Vann watched a movie during the evening of December 12, 2002 and that she had fallen asleep on the couch after K.H. went to bed. She told Cross that K.H. went to bed around 10:00 p.m. that evening and that the other two children were already asleep by that time. Humphries told Cross that K.H. had been a very healthy child and had not been in any type of accident and had not suffered from any type of medical disease. Humphries told Cross that she did not allow drugs in her home.
 {¶ 19} According to Cross, Humphries told him that while L.B. was getting ready for school, she had gotten up and was straightening up the house. She stated that K.H. had come downstairs and said "good morning", gave Humphries a kiss and asked her to help her unzip her pajamas so she could use the restroom. Humphries told him that K.H. first came downstairs at approximately 8:30 a.m. She indicated that between 8:30 and 9:00 a.m., K.H. came downstairs for a second time. Humphries indicated to Cross that K.H. had been wearing blue zip-up pajamas. Humphries told Cross that the first time K.H. came downstairs to use the restroom, Vann was on the couch watching T.V.
 {¶ 20} Cross stated that while he was interviewing Humphries at the hospital, a hospital staff member came in and informed them that K.H. had a severe brain injury and that there was bleeding and swelling in her brain. The staff member stated that the hospital thought that K.H. had fallen out of bed. The staff member asked them to go upstairs to the Pediatric Intensive Care Unit so that Humphries could see K.H. Before going to see K.H., Humphries went outside to smoke a cigarette. Cross accompanied Humphries outside while she smoked. She talked to him about how "ridiculous it was for the smokers to be separated from the buildings[.]" Cross testified that he felt that it was strange that Humphries had just been advised that her child was in serious condition but yet she was just talking about smoking and the weather.
 {¶ 21} Cross interviewed Humphries for a second time later that afternoon. Detective Robert Kuehner and Detective George of the Canton Police Department were also in attendance at this meeting. Cross noted that Humphries was very calm and unemotional at this second interview. Humphries reiterated her story to the detectives. Cross noted the discrepancies in her story which included her statement that K.H. came downstairs at 7:30 a.m., not 8:30 a.m., to use the restroom.
 {¶ 22} During this second interview, one of the officers asked to speak with her two other children. Humphries said that there was no need to see the children. The detectives also asked to interview Humphries `mother. *Page 7 
Humphries' mother was "outraged" at a request to speak with her and she refused to cooperate.
 {¶ 23} On December 14, 2002, Cross again spoke with Humphries. A social worker at Akron Children's called Cross and informed him that Humphries wanted to speak with him. Humphries told Cross that K.H. was brain dead and that she would be removed from life support. She told Cross that she had some information she needed to share with him and the detectives. Detective Keuhner came to Akron Children's to meet with Cross and Humphries for a third interview. K.H. died later that day.
 {¶ 24} Cross testified regarding numerous inconsistencies in her third interview. Cross noted that Humphries consistently asserted that K.H. was wearing blue pajamas, not pink ones with Minnie Mouse on them. Humphries admitted that there were indeed drugs in the house however, she denied that she had used them. Cross testified that he had learned through his investigation that Humphries had used drugs on December 12, 2002. Cross further explained that in his investigation he learned that no one else had witnessed K.H. use the restroom or walk downstairs on December 13, 2002. The interview ended when Humphries indicated that she did not feel well and no longer wanted to discuss this matter. Cross testified that he questioned whether Humphries was actually feeling ill. However, Cross also stated that he did not know that Humphries was pregnant at the time. He said he asked her if she was pregnant and she "indicated no."
 {¶ 25} Cross testified that after K.H. died, Humphries demanded that someone fully investigate her death. Cross testified that Humphries tested positive for marijuana three days after K.H.'s death. Cross acknowledged that marijuana can remain in a person's system for up to 30 days. He stated that Children's Services eventually took Humphries' other two children.
 {¶ 26} Detective Kuehner also testified for the State. On December 13, 2002, Detective Kuehner received a call to investigate K.H.'s injuries. Detective Kuehner testified regarding his interview of Humphries. Cross and another Canton detective were also present for the interview. Detective Kuehner described Humphries' demeanor during the interview as "unemotional, insensitive * * * even * * * calloused."
 {¶ 27} Detective Kuehner recounted Humphries' description of the events on the morning of December 13, 2002. L.B. awoke Humphries shortly before she left for school at 7:00 a.m. Humphries' five-year-old son, J.H., got himself ready for school. He left at around 8:50 a.m. Sometime around 7:00 a.m., K.H. came downstairs to use the restroom. K.H. said "good morning" to Humphries and Humphries unzipped her sleeper so that she could use the restroom. She used the restroom and then walked back upstairs on her own. K.H. came downstairs a second time around 9:00 a.m. to use the restroom again. She again used the *Page 8 
restroom and then walked back upstairs on her own to sleep. Sometime between 9:10 a.m. and 9:30 a.m., Humphries left the house to go to her mother's house.
 {¶ 28} Humphries told Detective Kuehner that K.H. had worn blue, one-piece pajamas to bed. She told Detective Kuehner that the children had put themselves to bed. Humphries also told Detective Kuehner that Vann worked as a street pharmacist. He testified that he interpreted this to mean that Vann was a drug dealer. Despite her admission that Vann sold drugs, Humphries adamantly denied that there was ever any drug use in her house.
 {¶ 29} Detective Kuehner testified that when he tried to talk with her other two children, she became completely uncooperative. She told him that he was not going to talk with her children and she got up and ran to confer with her mother. At this point, Humphries and her family became very belligerent and disorderly. They caused so much commotion that Detective Kuehner had to call security to come to the floor. Detective Kuehner advised Humphries that if she did not calm down, he was going to place her under arrest. She told him that she had placed her children in hiding and she was not going to let him speak with them. Eventually Humphries' family members decided to go and get the children. Humphries was adamant that she retrieve the children herself. Detective Kuehner advised her that it was very important that she remain with her gravely ill daughter in the hospital and that there were other family members who could retrieve the children. Humphries tried to speak with her children once they arrived at the hospital. He again precluded her from talking with the children before he talked with them.
 {¶ 30} Detective Kuehner testified that during his investigation, he gained information that led him to believe that K.H. did not suffer her injuries from a fall. Detective Kuehner explained that in his investigation, he learned that this injury is not common from someone falling. He also testified that he believed the injury occurred earlier than Humphries' reported. He also learned that K.H. wore pink one-piece pajamas to bed, not blue ones as Humphries claimed. Detective Kuehner also figured out that no one but Humphries saw K.H. come downstairs during the morning of December 13, 2002.
 {¶ 31} Detective Kuehner testified that he responded to Akron Children's again on December 14, 2002, pursuant to Humphries' request to speak with him. When he met with her, she requested that he "`dogmatically'" investigate this case and determine who was responsible for this crime.
 {¶ 32} When he confronted Humphries with the numerous inconsistencies in her story, she became evasive and tried to avoid answering the questions by trying to change the subject. She then stated that she had stomach pain and that she would not be able to complete the interview. Detective Kuehner did not believe her story. She did not provide any explanation as to the discrepancies. *Page 9 
Detective Kuehner advised Humphries during this interview that it was imperative that he investigate the house as soon as possible. He stated that from the time of the interview to when he actually gained entrance on December 16, 2002, the officers made several unsuccessful attempts to enter the home. Every few hours officers would go to her house to try to obtain a response at the door. The officers repeatedly reported that the house was secured and locked up and that no one answered the door. When he finally gained entrance on December 16, 2002, Humphries and her mother were present at the house. Detective Kuehner found a marijuana pipe and some marijuana residue in close proximity to the pipe.
 {¶ 33} Dr. Steven Sands, a neuroradiologist at Aultman Hospital, also testified for the State. Dr. Sands testified that he deals primarily with imaging of the brain, the spine, and the head and neck regions. Dr. Sands testified that on December 13, 2002, he reviewed a head CAT scan of K.H. He testified that the scan showed several abnormal areas. He stated that there were no visible signs of external trauma. He opined that K.H. had suffered a stroke or a contusion to the brain. Dr. Sands testified that this type of brain injury does not generally appear on CAT scanning for 12 to 24 hours. The CAT scan Dr. Sands reviewed was taken at 10:55 a.m. He also testified that it was unlikely that the injury could have occurred after 9:30 a.m. According to Dr. Sands, a person with an injury as serious as K.H. would not be able to walk and talk.
 {¶ 34} Dr. Phillip Aldana, a pediatric neurosurgeon at Akron Children's Hospital, also testified for the State. Dr. Aldana performed a neurological examination of K.H. when she arrived at Akron Children's Hospital. Dr. Aldana testified that he could not see any external or visible trauma to K.H.'s skull. He testified that the injury occurred four to six hours before 10:55 a.m., the time when the CAT scan was performed. He also testified that it would be nearly impossible for a person who suffered an injury as severe as K.H. suffered to be able to walk up and down stairs and/or be able to talk. Dr. Aldana further testified that he believed that K.H.'s injuries were caused by child abuse or shaking. He explained that the most common cause of injuries of this type, a subdural hematoma, is shaking. Dr. Steiner, Medical Director of Care Center at Akron Children's Hospital, testified that the fall described by Vann as occurring around 9:45 a.m., when he heard a loud noise upstairs, could not have caused K.H.'s fatal injury.
 {¶ 35} The only witness who testified on Humphries' behalf was Dr. Paul Byrne. Dr. Byrne, a Physician Director of Neonatology at St. Charles Mercy Hospital in Oregon, Ohio, and the Director of the Department of Pediatrics, testified that shaken baby syndrome is not a medically accepted injury. Dr. Byrne opined that K.H.'s death was caused by a chronic subdural hematoma, or a blood vessel in her brain that was constantly leaking, which was undiagnosed prior to her death. Dr. Byrne further testified that it is not uncommon that a child suffering from a chronic subdural hematoma will complain of headaches or have *Page 10 
a vomiting episode. He testified that unless a CAT scan is performed on the child, no one can detect the hematoma.
 {¶ 36} On appeal, Humphries argues that "[t]he only theory that makes sense is the one that was presented by the defense that K.H. was not injured intentionally." However, the Tenth District Court of Appeals has previously noted that "`[n]owhere in either R.C. 2903.11 or 2919.22 or in case law is there a requirement that a person intentionally cause harm to another as an essential element of the offense of * * * endangering children.'" State v. Gulertekin (Dec. 3, 1998), 10th Dist. No. 97APA12-1607, at *24, quoting State v. Nichols (Oct. 8, 1992), 10th Dist. No. 92AP-346, at *3. Rather, to obtain a conviction under R.C.2919.22(A), the State must prove the culpable mental state of recklessness. State v. McGee (1997), 79 Ohio St.3d 193, 195. R.C.2901.22(C) defines "recklessness" as follows:
 "A person acts recklessly when, with heedless indifference to the consequences, he perversely disregards a known risk that his conduct is likely to cause a certain result or is likely to be of a certain nature. A person is reckless with respect to circumstances when, with heedless indifference to the consequences, he perversely disregards a known risk that such circumstances are likely to exist."
 {¶ 37} It is well-settled under Ohio law that "[circumstantial evidence and direct evidence inherently possess the same probative value[.]" State v. Jenks (1991), 61 Ohio St.3d 259, paragraph one of the syllabus. Accordingly, it is not fatal to the State's case that there is no direct evidence that Humphries shook K.H. See State v.Gulertekin, supra, at *24. Upon review, we find significant circumstantial evidence that K.H. suffered from shaken baby syndrome and died as a result. Several witnesses testified regarding their conversations with Humphries regarding K.H.'s injuries. The record reflects that Humphries failed to provide a reasonable explanation for K.H.'s injuries and that she exhibited very suspicious behavior both on the day K.H. was admitted to the hospital and in the following days. Further, Humphries' accounts contained numerous inconsistencies including the time at which K.H. came downstairs on December 13, 2002, the color of pajamas she was wearing and whether there were drugs in her house. Humphries' recitation of K.H.'s actions on December 13, 2002 were implausible given medical evidence and testimony contradicting her assertion that K.H. was walking and talking around approximately 9:00 a.m. on December 13, 2002. Furthermore, Dr. Steiner testified that the fall described by Vann could not have caused the fatal injury.
 {¶ 38} Dr. Byrne's testimony that K.H.'s death was likely caused by a chronic subdural hematoma was unpersuasive. Dr. Byrne testified that such a condition is generally accompanied by flu-like symptoms such as vomiting and headaches. However, no one testified that K.H. had complained of headaches or had vomiting spells. To the contrary, Humphries told Cross that K.H. had been a *Page 11 
very healthy child and had not been in any type of accident and had not suffered from any type of medical disease. Moreover, "[a] conviction is not against the manifest weight of the evidence solely because the jury heard inconsistent testimony." State v. Kendall (June 29, 2001), 10th Dist. Nos. 00AP-1098, 00AP-1099, at *6.
 {¶ 39} Based on the evidence in the record, we cannot say that the jury clearly lost its way in finding Humphries guilty of child endangering which resulted in serious physical harm to K.H. R.C.2919.22(A) and (E)(2)(c). The medical testimony and evidence demonstrates that Humphries created a substantial risk of harm to her daughter, K.H., which resulted in a head injury that led to her death. Id.; R.C. 2901.22(C). Thus, the verdict was not contrary to the manifest weight of the evidence. Accordingly, Humphries' first assignment of error is overruled.
 ASSIGNMENT OF ERROR II "[HUMPHRIES] WAS DENIED A FAIR TRIAL DUE TO INEFFECTIVE ASSISTANCE OF COUNSEL FOR FAILURE TO REQUEST MISTRIAL FOR SPECTATOR OUTBURST."
 {¶ 40} In her second assignment of error, Humphries contends that she was denied a fair trial due to the ineffectiveness of her counsel in failing to request a mistrial after a spectator shouted at her in front of the jury. We find no merit in this contention.
 {¶ 41} In evaluating an ineffective assistance of counsel claim, this Court employs a two step process as described in Strickland v.Washington (1984), 466 U.S. 668, 687. First, the Court must determine whether there was a "substantial violation of any of defense counsel's essential duties to his client." State v. Bradley (1989),42 Ohio St.3d 136, 141; State v. Lytle (1976), 48 Ohio St.2d 391, 396, vacated in part on other grounds. Second, the Court must determine if prejudice resulted to the defendant from counsel's ineffectiveness. Bradley,42 Ohio St.3d at 141-142, citing Lytle, 48 Ohio St.2d at 396-397. "An appellate court may analyze the prejudice prong of the Strickland test alone if such analysis will dispose of a claim of ineffective assistance of counsel on the ground that the defendant did not suffer sufficient prejudice."State v. Kordeleski, 9th Dist. No. 02CA008046, 2003-Ohio-641, at ¶ 37, citing State v. Loza (1994), 71 Ohio St.3d 61, 83, overruled on other grounds. Prejudice exists where there is a reasonable probability that the trial result would have been different but for the alleged deficiencies of counsel. Bradley, 42 Ohio St.3d at paragraph three of the syllabus. Humphries bears the burden of proof, and must show that her "`counsel's errors were so serious as to deprive [her] of a fair trial, a trial whose result is reliable.'" State v. Colon, 9th Dist. No. 20949, 2002-Ohio-3985, at ¶ 48, quoting Strickland, 446 U.S. at 687. *Page 12 
 {¶ 42} The law is clear that debatable trial tactics do not give rise to a claim of ineffective assistance of counsel. State v. Clayton
(1980), 62 Ohio St.2d 45, 49. Even if we question trial counsel's strategic decisions, we must defer to his judgment. Id. The Ohio Supreme Court has stated that
 "`[w]e deem it misleading to decide an issue of competency by using, as a measuring rod, only those criteria defined as the best of available practices in the defense field.' * * * Counsel chose a strategy that proved ineffective, but the fact that there was another and better strategy available does not amount to a breach of an essential duty to his client." Id. quoting Lytle, 48 Ohio St.2d at 396.
 {¶ 43} Accordingly, a trial court must determine, as a question of fact, whether an emotional outburst deprived the defendant of a fair trial by improperly influencing the jury. See State v. Benge (1996),75 Ohio St.3d 136, 144; State v. Morales (1987), 32 Ohio St.3d 252, 255;State v. Bradley (1965), 3 Ohio St.2d 38, syllabus. "In the absence of clear, affirmative evidence to the contrary, the trial court's determination will not be disturbed." Morales, 32 Ohio St.3d at 255.
The outburst at issue herein involved the following exchange:
 The Court: "Hey. Let's get a couple things straightened out.
 A Spectator: "Hey.
 The Court: "All right. Have him go out.
 A Spectator: "Murder anyway. Murder my daughter. Get off me.
 The Court: "* * *
 The Bailiff: "* * *
 The Court: "Ladies and gentlemen, cases like this, as you know, can create emotion. And the fact is the difficult thing for you is, as we talked about earlier during the voir dire process, is that you have to be able to set any kind of emotion aside and just listen to the testimony and make your decision based on the evidence presented in this courtroom. So I'm going, with that spirit in mind, I'm going to ask you to disregard any outbursts.
 "And I will inform anybody in the back of the courtroom, obviously, I'm going to be very strict about any gestures, anything that would be, by the Court considered to be, ah, inappropriate and immediately will be, ah, asked to leave the courtroom and you won't be coming back in. So, let's keep that in mind." *Page 13 
 {¶ 44} Here, the record does not clearly demonstrate that the spectator's outburst had any impact on the jury. Immediately after the outburst, the court cautioned jurors to focus on the evidence and to disregard extrinsic matters in their decisionmaking. The jury is presumed to follow the court's instructions. See Pang v. Minch (1990),53 Ohio St.3d 186, 195. Furthermore, Humphries has failed to set forth clear evidence that this outburst deprived her of a fair trial by improperly influencing the jury. Benge, 75 Ohio St.3d at 144;Morales, 32 Ohio St.3d at 255. Consequently, Humphries cannot demonstrate that she suffered sufficient prejudice and we need not examine the first step of the Strickland test as our application of the second step is dispositive. Kordeleski, supra, at ¶ 37;Bradley, 42 Ohio St.3d at paragraph three of the syllabus. Accordingly, Humphries has failed to demonstrate that she was denied a fair trial because her trial counsel was ineffective.
 {¶ 45} Humphries' second assignment of error is overruled.
 ASSIGNMENT OF ERROR III "THE TRIAL COURT ERRED IN IMPOSING A MAXIMUM SENTENCE."
 {¶ 46} In her third assignment of error, Humphries contends that the trial court erred in imposing a maximum sentence.
 {¶ 47} "It is the duty of the appellant, not this court, to demonstrate [her] assigned error through an argument that is supported by citations to legal authority and facts in the record." State v.Taylor (Feb. 9, 1999), 9th Dist. No. 2783-M, at *3. See, also, App.R. 16(A)(7). "It is not the function of this court to construct a foundation for [an appellant's] claims; failure to comply with the rules governing practice in the appellate courts is a tactic which is ordinarily fatal." Kremer v. Cox (1996), 114 Ohio App.3d 41, 60.
 {¶ 48} Pursuant to App.R. 12(A) and 16(A)(7), an appellate court "may disregard an assignment of error `if the party raising it fails to identify in the record the error on which the assignment of error is based * * * as required under App.R. 16(A).'" Courie v. ALCOA,162 Ohio App.3d 133, 2005-Ohio-3483, at ¶ 17, quoting App.R. 12(B)(2), now App.R. 12(A)(2). See, also, Smith v. Akron Appeals Bd. of Dept. of PublicHealth, 9th Dist. No. 21103, 2003-Ohio-93, at ¶ 26-27. An appellant bears the burden of affirmatively demonstrating the error on appeal, and substantiating his or her arguments in support. Angle v. Western ReserveMut. Ins. Co. (Sept. 16, 1998), 9th Dist. No. 2729-M, at *1; Frecska v.Frecska (Oct. 1, 1997), 9th Dist. No. 96CA0086, at *2. See, also, App.R. 16(A)(7). As Humphries' argument fails to comply with the foregoing appellate rule requirements, she has failed to meet her burden on appeal. *Page 14 
 {¶ 49} We note that Humphries has also alleged that the trial court was required to conduct a pre-sentence investigation. Humphries has not supported her proposition that the trial court was required to conduct a pre-sentence investigation. See App.R. 16(A)(7). Upon review, this Court can find no authority for such a proposition.
 {¶ 50} Accordingly, Humphries' third assignment of error is overruled. III.
 {¶ 51} Humphries' three assignments of error are overruled, and the judgment of the Stark County Court of Common Pleas Court is affirmed.
Judgment affirmed.
The Court finds that there were reasonable grounds for this appeal.
We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Stark, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.
Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(E). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.
Costs taxed to Appellant.
CARLA MOORE FOR THE COURT
SLABY, P. J. CONCURS