[Cite as *State v. Stein*, 2014-Ohio-222.]

COURT OF APPEALS
RICHLAND COUNTY, OHIO
FIFTH APPELLATE DISTRICT


| | | |
|---|---|---|
| STATE OF OHIO | : | JUDGES: |
| | : | |
| | : | Hon. John W. Wise, P.J. |
| Plaintiff - Appellee | : | Hon. Patricia A. Delaney, J. |
| | : | Hon. Craig R. Baldwin, J. |
| | : | |
| -vs- | : | |
| | : | |
| MATTHEW STEIN | : | Case No. 13CA51 |
| | : | |
| | : | |
| Defendant - Appellant | : | O P I N I O N |


CHARACTER OF PROCEEDING:     Appeal from the Richland County
                             Court of Common Pleas, Case No.
                             2005-CR-224



JUDGMENT:                    Affirmed



DATE OF JUDGMENT:            January 21, 2014



APPEARANCES:

For Plaintiff-Appellee                For Defendant-Appellant

JAMES J. MAYER, JR.                   DONALD R. CASTER
Prosecuting Attorney                  Ohio Innocence Project
                                      University of Cincinnati
By: BAMBI COUCH PAGE                  College of Law
Assistant Prosecuting Attorney        P.O. Box 210040
38 South Park Street                  Cincinnati, OH 45221
Mansfield, OH 44902

*Baldwin, J.*

{¶1}    Defendant-appellant Matthew Stein appeals from the May 8, 2013 Decision of the Richland County Court of Common Pleas overruling his Motion for Leave to File a Motion for New Trial. Plaintiff-appellee is the State of Ohio.

STATEMENT OF THE FACTS AND CASE

{¶2}    The facts, as taken from this Court's Opinion in *State v. Stein*, 5th Dist. Richland No.  05 CA 103, 2007-Ohio- 1153 are as follows.

{¶3}    On October 27, 2003, Aiden Stein was born to Arica Heimlich and appellant Matthew Stein. Aiden was born with his umbilical cord around his neck, but he suffered no trauma as a result. For the first four and one-half months of his life, Aiden was generally a normally developing baby boy. On March 14, 2004, Arica, his mother, woke Aiden up and fed him at approximately 6:30 AM. When she left for work at 7:43 AM, leaving Aiden in appellant's care, the baby appeared fine. However, at about 10:30 AM that day, appellant banged on the door of his neighbor, Gerald Holland, stating that Aiden had stopped breathing.

{¶4}    Holland immediately took the baby from appellant's arms and checked him for signs of choking. Finding nothing, Holland began performing CPR and directed his girlfriend to call 911. Paramedics arrived about five minutes later and transported Aiden to Med Central Hospital. The emergency room physician, Dr. Anthony Midkiff, was told by the paramedics and appellant that the baby had gagged while nursing from a bottle. Dr. Midkiff later testified that he did not see the usual symptoms of choking in Aiden during the examination.

{¶5}    Aiden was intubated and transported by helicopter to Akron Children's Hospital. Dr. Daryl Steiner thereupon took over treatment of Aiden. A CT scan revealed evidence of extensive bleeding around Aiden's brain, as well as indications of "older" blood in the baby's subdural region. Dr. Steiner further observed indication of brain swelling and discovered a skull fracture on the left side of Aiden's skull. Dr. Steiner also observed Aiden had severe retinal hemorrhages, not in the nature of hemorrhages caused by birth. His eventual diagnostic conclusion was that Aiden had suffered brain damage caused by physical abuse. Two other examining physicians at Akron Children's, Dr. Vivek Malhotra and Dr. John Pope, concurred in the diagnosis.

{¶6}    In the meantime, the Mansfield Police Department and Richland County Children's Services began an investigation concerning Aiden's injuries, which had left him in a permanent vegetative state. On April 7, 2005, the Richland County Grand Jury indicted appellant on one count of felonious assault and one count of child endangering, both felonies of the second degree. The matter proceeded to a jury trial which commenced on August 25, 2005, and lasted until September 7, 2005. The State's theory of the case was premised on Shaken Baby Syndrome. At the conclusion of the trial, the jury found appellant guilty on both counts of the indictment.

{¶7}    A sentencing hearing was conducted on September 12, 2005. The trial court thereupon imposed the statutory maximum sentence of eight years in prison for the offense of felonious assault. The court further found the child endangering charge to be an allied offense of similar import; hence, appellant was not sentenced for such offense.

{¶8}     Appellant appealed his conviction and sentence. Pursuant to an Opinion filed on March 14, 2007 in *State v. Stein*, 5th Dist. Richland No. 05 CA 103, 2007-Ohio-1153, this Court affirmed appellant's conviction and sentence.

{¶9}     Subsequently, on January 18, 2013, appellant filed a Motion for Leave to File a Motion for New Trial pursuant to Crim.R. 33. Appellant, in his motion, alleged that he was entitled to a new trial based on the following: (1) Aiden had been diagnosed with a medical disorder that caused his subdural hematoma, (2) since the time of appellant's trial, the beliefs upon which the diagnosis of "Shaken Baby Syndrome" once rested had been discredited, and (3) Dr. Daryl Steiner, who was the key medical witness against appellant, had changed his own opinion regarding such syndrome. Appellant's motion was supported by an affidavit from Dr. Michael Laposata, M.D., Ph.D., the report of Dr. John Plunkett, and transcripts. Appellee filed a response to such motion on March 27, 2013.    Appellee's response was supported by the affidavit of Dr. R. Daryl Steiner, articles and a transcript.

{¶10}   Pursuant to a Decision filed on May 6, 2013, the trial court overruled appellant's motion.

{¶11}   Appellant now raises the following assignment of error on appeal:

{¶12}   THE TRIAL COURT ABUSED ITS DISCRETION IN DENYING DEFENDANT'S MOTION FOR LEAVE TO FILE A MOTION FOR NEW TRIAL.

I

{¶13}   Appellant, in his sole assignment of error, argues that the trial court abused its discretion in denying his Motion for Leave to File a Motion for New Trial.

{¶14}    Crim.R. 33 governs new trials. Subsections (A)(6) and (B) state the following:

{¶15}    A new trial may be granted on motion of the defendant for any of the following causes affecting materially his substantial rights:

{¶16}    (6) When new evidence material to the defense is discovered which the defendant could not with reasonable diligence have discovered and produced at the trial. When a motion for a new trial is made upon the ground of newly discovered evidence, the defendant must produce at the hearing on the motion, in support thereof, the affidavits of the witnesses by whom such evidence is expected to be given, and if time is required by the defendant to procure such affidavits, the court may postpone the hearing of the motion for such length of time as is reasonable under all the circumstances of the case. The prosecuting attorney may produce affidavits or other evidence to impeach the affidavits of such witnesses.

{¶17}    * * *Motions for new trial on account of newly discovered evidence shall be filed within one hundred twenty days after the day upon which the verdict was rendered, or the decision of the court where trial by jury has been waived. If it is made to appear by clear and convincing proof that the defendant was unavoidably prevented from the discovery of the evidence upon which he must rely, such motion shall be filed within seven days from an order of the court finding that he was unavoidably prevented from discovering the evidence within the one hundred twenty day period.

{¶18} The Ohio Supreme Court has set forth the following requirements concerning motions for a new trial based upon newly discovered evidence: "To warrant the granting of a motion for a new trial on the ground of newly discovered evidence, it must be shown that the new evidence (1) discloses a strong probability that it will change the result of a new trial if granted; (2) has been discovered since the trial; (3) is such as could not in the exercise of due diligence have been discovered before the trial; (4) is material to the issues; (5) is not merely cumulative to former evidence; and (6) does not merely impeach or contradict the former evidence." *State v. Petro*, 148 Ohio St. 505, 76 N.E.2d 370 (1947), syllabus.

{¶19} We review the trial court's decision to grant or deny the motion under an abuse of discretion standard, "The granting of a motion for a new trial upon the ground named [newly discovered evidence] is necessarily committed to the wise discretion of the court, and a court of error cannot reverse unless there has been a gross abuse of that discretion. And whether that discretion has been abused must be disclosed from the entire record." *Petro,* supra, 148 Ohio St. at 507–508 (Quoting *State v. Lopa,* 96 Ohio St. 410, 411, 117 N.E. 319 (1917)). An abuse of discretion is more than an error of law or judgment and implies that the court's attitude is unreasonable, arbitrary or unconscionable. *Blakemore v. Blakemore,* 5 Ohio St.3d 217, 219, 450 N.E.2d 1140(1983). When applying the abuse of discretion standard, an appellate court may not substitute its judgment for that of the trial court. *Pons v. Ohio State Med. Bd.,* 66 Ohio St.3d 619, 621,1993-Ohio-122,  614 N.E.2d 748.

{¶20} Crim.R. 33(B) provides that if a defendant fails to file a motion for a new trial within 120 days of the jury's verdict, he or she must seek leave from the trial court

to file a delayed motion. To obtain leave, the defendant must show by clear and convincing proof that he or she was unavoidably prevented from discovering the evidence within the 120 days. *State v. Lordi,* 149 Ohio App.3d 627, 2002–Ohio–5517, 778 N.E.2d 605, ¶ 26–27. Clear and convincing proof is that which will produce in the mind of the trier of fact a firm belief or conviction as to the facts sought to be established. *In re Adoption of Holcomb,* 18 Ohio St .3d 361, 368, 481 N.E.2d 613(1985); *Lordi,* supra, at ¶ 26.

{¶21}   The "phrases 'unavoidably prevented' and 'clear and convincing proof' do not allow one to claim that evidence was undiscoverable simply because affidavits were not obtained sooner." *State v. Williams,* 12th Dist. Butler No. CA2003–01–001, 2003–Ohio–5873, ¶ 21.

{¶22}   As is stated above, appellant argues, in part, that he has newly discovered evidence that Aiden has been diagnosed with a medical disorder that caused his subdural hematoma. Appellant specifically points to the affidavit of Michael Laposata, M.D., PH.D., Pathologist in Chief at Vanderbilt University Hospital and Professor of Pathology and of Medicine at Vanderbilt University School of Medicine. Dr. Laposata, in his affidavit, stated, in relevant part, as follows:

{¶23}   11. In the case of Aiden Stein, a major finding that was overlooked in the initial evaluations of the patient that inappropriately resulted in an accusation of child abuse.  This child has extremely high levels of blood triglycerides and cholesterol. These are major blood fats in the body.  There was a definite error in diagnosis when it was stated that these extremely high, persistently elevated values were exclusively a result of drawing blood samples after the patient had eaten.  It is a well established

medical fact that triglyceride levels will increase on the order of 10 to 20% after eating. So if this patient had a high normal value of approximately 200 milligrams per deciliter, after eating, the value might reach 240. This patient's values were consistently in the vicinity of 1000 mg per deciliter within normal range of 60 to 134. Patients do not have triglyceride values in this range unless there is a disorder, commonly a genetic disorder, associated with the metabolism of blood fats.

{¶24} 12**.** The patient's blood cholesterol value was also extremely high, on the order of 300 mg per deciliter, at a level that leads to premature disease of the blood vessels. The desirable range for blood cholesterol is less than 200 mg per deciliter.

{¶25} 13. Aiden Stein's blood lipid values have been associated with other markedly abnormal blood test results that showed disease of his liver, his kidneys, his pancreas, and his endocrine organs.

{¶26} 14. Taken together, this is a very sick child as a result of an underlying disease associated with high levels of blood fats. It is with a high degree of medical certainty that Aiden Stein's blood vessels have been adversely affected by his extremely high levels of circulating triglycerides and cholesterol.

{¶27} In paragraph 17 of his affidavit, Dr. Laposata further states as follows: "Taken together, the overall picture indicates that the child has a genetic disorder associated with high blood fats; the high blood fats have made his blood vessels fragile; and the spontaneous rupture of his weakened blood vessels resulted in the observed bleeding and bruising events in this child. With a high degree of medical certainly, it can be stated that there is no need to invoke trauma of any kind to explain the observed findings in the patient."

{¶28}    However, there is no evidence that appellant could not have discovered such evidence before the trial or within 120 days of the jury's verdict. As noted by the trial court in its decision, the triglyceride evidence on which such doctor based his opinion that Aiden had an unspecified lipid disorder was available at the time of trial.  If Aiden indeed has a genetic disorder, he would have had it at the time of the incident that resulted in the criminal charges in this case.  Moreover, Dr. Laposata, in his affidavit, does not allege that he had examined Aiden or that any genetic testing was performed that confirmed his diagnosis. Rather, he states that he reviewed all of Aiden's medical records and diagnosed Aiden based on his extensive medical history.  To date, there is no evidence that Aiden has actually been diagnosed with a genetic disorder associated with high blood fats.   Appellant, in his brief, states in footnote 6 on page 11 that "[f]urther genetic testing may pinpoint the precise lipid disorder from which Aiden suffers. The Ohio Innocence Project is currently examining the economic feasibility of having Aiden's genome mapped for this purpose."  We concur with appellee that Dr. Laposata's speculation that Aiden might suffer from a lipid disorder, without any testing or proof, does not create a substantial probability that the outcome of his trial would have been different with such information.

{¶29}    Appellant further contends that he was entitled to a new trial because, since the time of appellant's trial, the beliefs upon which the diagnosis of "Shaken Baby Syndrome" (SBS) once rested have been discredited. Appellant, in support of such argument, relied on the report of Dr. John Plunkett, a general and forensic pathologist. Dr. Plunkett, in his report, stated that "[t]here has been a

fundamental change in physician's understanding of pediatric head injury beginning in approximately 2000 and accelerating since 2005." One of the eleven areas that Dr. Plunkett indicates that there was a change in was the improbability of "shaking" as a mechanism for brain injury."

{¶30} However, such evidence is clearly not newly discovered. In his own report, Dr. Plunkett states that the change began in approximately 2000, which clearly predates appellant's 2005 trial. The vast majority of the references to medical research cited by Dr. Plunkett in his report were published before the 2005 trial and thus could have been discovered with due diligence. Of even greater significance is that fact that Dr. Steiner testified at trial, when cross-examined, that he knew Dr. Plunkett and that while "he [Dr. Plunkett] agrees that it (SBS) can occur, but he also – his main premise is that shortfalls can cause similar findings." Transcript, Volume III at 751. Thus, Dr. Plunkett's existence, and his medical theories, were familiar to appellant back in 2005. Moreover, Dr. Plunkett testified as to the same theories and explanations as offered in his report as early as 2003. See *State v. Butts*, 10th Dist. No. 03AP–495, 2004 -Ohio- 1136.

{¶31} While appellant, in his brief, cites to *State v. Edmunds*, 308 Wis.2d 374, 746 N.W.2d 590 (2007), a Wisconsin case, for the proposition that a shift in the medical community regarding Shaken Baby Syndrome (SBS) consisted of newly discovered evidence, we note that "[w]hile there are experts who disagree about SBS, it remains an accepted theory in this state and others." *State v. Milby*, 12th Dist Warren No. CA2013-02-014, 2013-Ohio-4331 at paragraph 27. The Court in *Milby* stated that while there was a disagreement between experts on the diagnosis of SBS, particularly

where there was no evidence of some impact injury, the theory of SBS had not been discredited.

{¶32}   As noted by appellee, neither the report  of Dr. Plunkett nor the affidavit of Dr. Laposata provided any explanation as to why the information contained in the same could not have been provided within the 120 day time limit set forth in Crim.R. 33.  The medical opinions of both were available in 2005 and could have been discovered with the exercise of due diligence.

{¶33}   Appellant finally argues that he is entitled to a new trial because the opinion of Dr. Steiner, who was the key medical witness against appellant, had changed regarding SBS. Appellant, in his motion, alleged that Dr. Steiner had recently testified that he would no longer diagnose SBS in the absence of an eyewitness who could corroborate that the baby was, indeed, shaken.  Appellant points out that there was no eyewitness corroborating shaking in this case. Appellant supported his motion with excerpts from a deposition of Dr. Steiner taken in October of 2010, as well as excerpts from a trial in Summit County Court of Common Pleas, Juvenile Division, from June of 2007.  Dr. Steiner, during such deposition, testified as follows when asked whether it was his testimony that he did not diagnose SBS in the absence of a witness to the shaking: "I would say that earlier in my career, before I received the—before I was—before there was information that tended to refine my diagnosis, to define my evaluation and approach to these children, early in my career I would have made the diagnosis of shaken baby syndrome without a witness to that. At this point in my career and at the point here, I would say that I would not make the case and make the diagnosis of shaken baby syndrome without a witness and a verification of the mechanism of injury."

Appellant also supported his motion with excerpts from a 2007 Juvenile case out of Summit County in which Dr. Steiner testified that subdural hematomas can spontaneously bleed. Appellant points out that Dr. Steiner, during the trial in this case, testified that he had never heard of a subdural hematoma that occurred at birth spontaneously rebleeding.

{¶34} However, Dr. Steiner, in an affidavit attached to appellee's memorandum in opposition to appellant's motion, stated, in relevant part, as follows:

{¶35} 15. Affiant further states that the testimony referenced by the Innocence Project which is being used in attempt to support their position that the Affiant would no longer diagnose "Shaken Baby Syndrome" without an eyewitness is from testimony in a civil trial where Affiant was explaining that the mechanism of Shaken Baby, i.e., shaking, could not be confirmed without a witness. The diagnosis remains that same with or without a witness, as always has been the case.

{¶36} 16. Affiant further states the proposition that "Dr. Steiner would subsequently recant his deeply held medical opinions" is false, misleading and completely inaccurate, as well.

{¶37} 17. Affiant states that since 2005 he had diagnosed numerous cases of Abusive Head Injury Shaken/Baby Syndrome without an eyewitness confirming the shaking of the baby.

{¶38} 18. Affiant further states that in the calendar year 2012 alone, he has diagnosed Shaken Baby Syndrome/Abusive Head Trauma on 11 occasions.

{¶39} 19. Affiant further states that as recent as February 25, 2013, he diagnosed Shaken Baby Syndrome suffered by a child without an eyewitness to the events.

{¶40} In his affidavit, he further reaffirmed his diagnosis of Aiden within a reasonable degree of medical certainty. Thus, Dr. Steiner did not change his opinion with respect to the cause of Aiden's injury in this case. Moreover, as is stated above, two other examining physicians at Akron Children's, Dr. Vivek Malhotra and Dr. John Pope, concurred in the diagnosis as did Dr. Anthony Locastro and Dr. Max Wiznitzer. We find that such evidence does not disclose a strong probability that it will change the result of a new trial if granted and that it seeks merely to impeach or contradict the former testimony.

{¶41} Based on the foregoing, we find that the trial court did not abuse its discretion in denying appellant's motion because appellant did not meet the criteria set forth in *Petro*, supra. to warrant the granting on a motion for a new trial on the ground of newly discovered evidence. The trial court's decision was not arbitrary, unconscionable or unreasonable.

{¶42} Appellant's sole assignment of error is, therefore, overruled.

{¶43}   Accordingly, the judgment of the Richland County Court of Common Pleas is affirmed.

By: Baldwin, J.

Wise, P.J. and

Delaney, J. concur.