[Cite as *State v. Gaver*, 2016-Ohio-7055.]

COURT OF APPEALS
STARK COUNTY, OHIO
FIFTH APPELLATE DISTRICT

| | | |
|---|---|---|
| STATE OF OHIO | : | JUDGES: |
| | : | |
| | : | Hon. John W. Wise, P.J. |
| Plaintiff-Appellee | : | Hon. Patricia A. Delaney, J. |
| | : | Hon. Craig R. Baldwin, J. |
| -vs- | : | |
| | : | Case No. 2015CA00204 |
| | : | |
| RICHARD W. GAVER | : | |
| | : | |
| | : | |
| Defendant-Appellant | : | O P I N I O N |

CHARACTER OF PROCEEDING:              Appeal from the Stark County Court of
                                      Common Pleas, Case No. 2015CR0540

JUDGMENT:                             AFFIRMED

DATE OF JUDGMENT ENTRY:               September 26, 2016

APPEARANCES:

For Plaintiff-Appellee:                   For Defendant-Appellant:

JOHN D. FERRERO, JR.                      ANTHONY KOUKOUTAS
STARK CO. PROSECUTOR                      116 Cleveland Ave. North Ste. 808
RENEE M. WATSON                           Canton, OH 44702
110 Central Plaza South, Ste. 510
Canton, OH 44702-1413

*Delaney, J.*

{¶1}   Appellant Richard W. Gaver appeals from the October 9, 2015 Judgment Entry of the Stark County Court of Common Pleas.  Appellee is the state of Ohio.

**FACTS AND PROCEDURAL HISTORY**

{¶2}   This case arose on Sunday, March 9, 2014, when A.G. was 34 months old. A.G. is the son of Mother and Aaron Gesquiere ("Father").  Mother and Father are divorced but share custody of A.G. with a visitation schedule of one week on, one week off.  Appellant was Mother's boyfriend in March 2014; by trial they were married.  As of March 2014, the couple lived together with their six children ranging in age from 2 years to 10 years old: three of Mother's, including A.G., and three of appellant's.  Mother worked as a home health aide seven days a week.  Appellant watched the children while Mother was at work.

*A.G.'s Pre-Existing Condition*

{¶3}   From infancy A.G. was under the care of a pediatric neurologist at Akron Children's Hospital due to developmental delays and hypotonia (poor muscle tone).  Dr. Abdalla testified A.G. had a larger head than normal, describing his head as within the "normal range" but at the upper end of that range.  An M.R.I. in 2011 showed evidence of white matter disease in A.G.'s brain, likely stemming from a birth injury.  Dr. Abdalla said A.G.'s condition was similar to cerebral palsy, although A.G. did not have a clinical diagnosis of cerebral palsy and had shown improvement as he grew.  Doctors did find periventricular leukomalacia in his brain, which is damage to the white matter of the brain. A.G. did not have a specific diagnosis before March 2014 and his symptoms at that point

were developmental delays, especially with speech. Mother described him otherwise as a happy, active child. He had never experienced a seizure.

{¶4} A.G. was with Mother the week preceding Sunday, March 9, and Father had visited that Wednesday. As of Wednesday, A.G. was behaving normally and Father did not observe any health concerns. Mother testified A.G. had a cold during the week and ran a low fever.

**Sunday, March 9**

{¶5} On Sunday, March 9, Mother woke up late and appellant drove her to work at the home of her first care appointment, around 8:30 a.m. The children remained at home without an adult until appellant returned. Appellant prepared breakfast for the six children and A.G. ate half of a pancake, which was not an unusual amount for him to eat.

{¶6} Around 11:45 a.m., appellant began to prepare the children to leave the house to pick up Mother from work. The six children were "lined up" in the living room and appellant's attention was diverted as he picked up a bag of trash to take out. He heard a thump and observed A.G. laying on the floor; the other children told appellant A.G.'s eyes rolled back into his head and he collapsed to the floor.

{¶7} Accounts differ on what appellant did next. He told police he texted Mother and told her about A.G.'s apparent seizure; Mother told at least one investigator that she called appellant to find out why he was late to pick her up from work and he then told her A.G. had collapsed on the floor. All agree appellant drove the children to pick up Mother, with an older daughter holding A.G.'s head in the car. Mother dropped off appellant and the children at home and took A.G. to Mercy Medical Center.

*Mercy Medical Center: First Visit*

{¶8}   Dr. Spangler examined A.G. in the Mercy Medical Center emergency room. Mother said A.G. had fallen and was atypically lethargic; Spangler's notes indicated he was told A.G. fell "outside" and he was not advised of any seizure activity.  Spangler ordered a CT scan which was read by a radiologist who observed evidence of past trauma but no acute abnormality.  Spangler testified on cross-examination he questioned the radiologist because he observed "increased attenuation" on the CT scan: a "bright" appearance on the brain that could be blood.  Spangler relied upon the radiologist's reading of the scan and sent Mother and A.G. home from the hospital with instructions to keep an eye on A.G.

{¶9}   A radiologist at Akron Children's Hospital ("Children's") later reviewed the CT scan from Mercy Medical Center and observed an acute subdural hemorrhage, or bleeding on the brain.  When asked to explain why the record of the Mercy visit contained no mention of a brain bleed, the Children's radiologist explicitly disagreed with the Mercy radiologist's findings.  (T. 53-55).

{¶10} A.G. and Mother returned home around 2:00 p.m. and A.G. went down for a nap.  Appellant drove Mother to work at a second job location.  Upon his return, he went to wake up A.G. to dress the child to go to Father's house.  He found A.G. to be unusually lethargic and unresponsive.  While dressing A.G., the child's face turned white with red splotches and his arms and legs seized.  A.G.'s eyes rolled back and he collapsed, although appellant caught him before he hit the floor.

*Mercy Medical Center: Second Visit and Referral to Akron Children's Hospital*

{¶11} Appellant texted Mother and told her of the most recent issue with A.G. She instructed appellant to come pick her up. Appellant, A.G., and Mother returned to Mercy Medical Center. Father met them at Mercy and A.G. was transported to Children's.

{¶12} At Children's, an M.R.I. confirmed the presence of a subdural hemorrhage; according to Children's protocol, this diagnosis required referral to the hospital's CARE center, which evaluates possible cases of neglect and abuse. Dr. Daryl Steiner is the medical director of the CARE center and was one of the physicians in a team that cared for A.G. for nine days after he was admitted to Children's.

{¶13} Steiner's review of a Children's CT scan and the M.R.I. confirmed bleeding on the brain. Steiner described A.G.'s subdural hematoma as the collection of blood inside the head, along the curvature of the brain, between the skull and the brain. A.G.'s bleeding was throughout the left hemisphere of his brain. Steiner opined that the leading cause of a subdural hematoma is a traumatic brain injury.

{¶14} Subsequent evaluation revealed a second injury to A.G.: retinal hemorrhages in multiple layers of the nerve tissue in both eyes.

*Steiner's Opinion of Cause of Injuries: Abuse*

{¶15} Steiner diagnosed the cause of A.G.'s injuries as an act of child abuse based upon the traumatic brain injury resulting in subdural and retinal hemorrhages; no evidence existed of any accidental traumatic event in A.G.'s history significant enough to have caused these injuries; and both injuries were significant enough to require a "violent traumatic event." The only traumatic event described in A.G.'s history was falling to the floor from a standing position, which was not significant enough to cause the injuries.

{¶16} Steiner also pointed out that the brain itself is important in determining how the injury occurred; if a child is bumped on the head and a subdural hemorrhage forms, the bleeding is under the area of the bump. A.G.'s bleeding was along the entire curvature of his brain, so this injury did not result from a bump to the head. To determine the mechanism of the injury, Steiner considered the retinal hemorrhages and the fact that the retinal hemorrhages were in multiple layers. The trauma, he opined, resulted from "violent rotation or whiplash rotation of the head either back to front or side to side or around to cause that trauma to the brain and the eyes." (T. 31).

{¶17} Steiner further opined this was not an accidental event based upon three factors: 1) whether the history of the injury is consistent, i.e. is the same story told each time; 2) whether the history is plausible, meaning is the injury consistent with the child's developmental capabilities; and 3) whether the injury is congruent with the history. In this case the history was inconsistent, implausible, and incongruent. Steiner testified one of appellant's explanations of the injury, that A.G. injured himself when he bumped his head on the bunkbed ladder, is incongruent because a child of his size is not capable of accidentally hitting the ladder hard enough to cause an intercranial event.

*Investigation and Appellant's Trial Testimony: Bunk Bed Story*

{¶18} The CARE Center contacted the Stark County Sheriff's Office and Deputies Von Spiegel and Konic investigated. Appellant and Mother were interviewed and Von Spiegel noted in the first interview an unexplained inconsistency: appellant claimed to have texted Mother immediately to tell her about A.G.'s condition, but Mother said appellant failed to pick her up from work, she had to call him more than once, and only once she reached appellant did he mention A.G. fell down.

{¶19} During a second interview, Konic spoke with appellant and asked about the source of A.G.'s injuries, which remained unexplained. Appellant responded that earlier in the day, he and A.G. had been playing in a bedroom and a football rolled under the bed. A.G. crawled underneath the bed to retrieve it and appellant startled him as he was crawling out, causing A.G. to bump his head on the nearby bunkbed ladder. This interview was the first time this episode was revealed. Appellant said the bump from the bunkbed ladder occurred about 15 minutes before the fall in the kitchen.

{¶20} Appellant testified at trial and said March 9 was an otherwise normal day until he and A.G. were playing in the bedroom and A.G. bumped his head on the bunkbed ladder. Appellant acknowledged he never told the bunk bed story to Mother, medical providers, or social workers, and said he only brought it up in the sheriff's interview because the deputy told him the injuries could not result from a fall. Appellant testified he never intentionally hurt A.G. and was unaware of any other incident that could have caused the injuries.

*Indictment, Trial, and Conviction upon Count II*

{¶21} Appellant was charged by indictment with one count of child endangering pursuant to R.C. 2919.22(B)(1)(E)(2)(d),[1] a felony of the second degree [Count I], and one count of child endangering pursuant to R.C. 2919.22(A)(E)(2)(c),[2] a felony of the third

---

[1] R.C. 2919.22(B)(1)(E)(2)(d) states in pertinent part: "No person shall do any of the following to a child under eighteen years of age or a mentally or physically handicapped child under twenty-one years of age: (1) Abuse the child; (E)(1) Whoever violates this section is guilty of endangering children. (2) If the offender violates division (A) or (B)(1) of this section, endangering children is one of the following, * * * : (d) If the violation is a violation of division (B)(1) of this section and results in serious physical harm to the child involved, a felony of the second degree."

[2] R.C. 2919.22(A)(E)(2)(c) states in pertinent part: "No person, who is the parent, guardian, custodian, person having custody or control, or person in loco parentis of a child

degree [Count II]. According to appellee's bill of particulars filed April 29, 2015, Count I referenced appellant's abuse of A.G., "causing a subdural hematoma and retinal hemorrhages, serious physical harm." Count II referenced appellant, "while being the person in loco parentis, did create a substantial risk to the health or safety of [A.G.], a child under eighteen (18), by violating a duty of care, protection, or support to the health or safety of [A.G.], which resulted in Serious Physical Harm to [A.G.]." Appellant entered pleas of not guilty.

{¶22} On July 21, 2015, appellant filed a "Motion for a Hearing on the Admissibility of Expert Opinion Testimony (Pursuant to *Daubert v. Merrell Dow Pharmaceutical, Inc.*) and Motion in Limine." Appellant argued the opinion of Dr. Daryl Steiner (that A.G.'s injuries can only be the result of abuse) is not supported by any accepted, tested, and reviewed theory in the medical community and should therefore be excluded from trial. Appellee filed a response in opposition.

{¶23} The matter proceeded to trial by jury with a *Daubert* hearing outside the presence of the jury after jury selection. The trial court overruled appellant's motion to exclude Steiner's testimony.

{¶24} Appellant was found not guilty upon Count I and guilty upon Count II. The jury also found the offense as charged in Count II resulted in serious physical harm to the victim.

---

under eighteen years of age or a mentally or physically handicapped child under twenty-one years of age, shall create a substantial risk to the health or safety of the child, by violating a duty of care, protection, or support. * * * *. (E)(1) Whoever violates this section is guilty of endangering children. (2) If the offender violates division (A) or (B)(1) of this section, endangering children is one of the following * * * : (c) If the violation is a violation of division (A) of this section and results in serious physical harm to the child involved, a felony of the third degree[.]"

{¶25} Appellant filed post-trial motions for acquittal pursuant to Crim.R. 29(C) and for new trial pursuant to Crim.R. 33. Appellee responded with a motion in opposition. The trial court overruled the motions but delayed imposition of sentence pending appeal.

{¶26} Appellant was sentenced to a term of 36 months on community control, including six months of local incarceration.

{¶27} Appellant now appeals from the trial court's judgment entry of conviction and sentence dated October 9, 2015.

{¶28} Appellant raises two assignments of error:

**ASSIGNMENTS OF ERROR**

{¶29} "I.   APPELLANT WAS DENIED DUE PROCESS WHEN THE COURT PERMITTED EVIDENCE WHICH DID NOT COMPLY WITH *DAUBERT*."

{¶30} "II.   APPELLANT'S CONVICTION WAS AGAINST THE MANIFEST WEIGHT AND SUFFICIENCY OF THE EVIDENCE."

**ANALYSIS**

I.

{¶31} In his first assignment of error, appellant argues he was denied due process because the trial court permitted introduction of evidence of shaken baby syndrome which did not comply with *Daubert*. We disagree.

{¶32} We apply an abuse-of-discretion standard in reviewing a trial court's decision to admit or exclude expert testimony. *State v. Bracone*, 5th Dist. Tuscarawas No. 2013 AP 11 0046, 2014-Ohio-4058, 19 N.E.3d 585, ¶ 84, citing *Gen. Elec. Co. v. Joiner,* 522 U.S. 136, 144–146, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997); *State v. Williams,* 4 Ohio St.3d 53, 58, 446 N.E.2d 444 (1983). "An abuse of discretion 'suggests

unreasonableness, arbitrariness, or unconscionability. Without those elements, it is not the role of this court to substitute its judgment for that of the trial court.'" Id., citing *Valentine v. Conrad,* 110 Ohio St.3d 42, 2006-Ohio-3561, 850 N.E.2d 683, ¶ 20*.*

{¶33} Appellant argues the trial court's analysis pursuant to the test set forth in *Daubert v. Merrill Dow Pharmaceutical, Inc.*, 509 U.S. 579, 589, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), was insufficient to permit the expert testimony of Dr. Steiner. Pursuant to *Daubert,* the trial judge must perform a "gate keeping" role to ensure that expert testimony is sufficiently (a) relevant and (b) reliable to justify its submission to the trier of fact. *State v. Butler*, 5th Dist. Stark No. 2013CA00053, 2013-Ohio-4451, ¶ 17. In general terms, the reliability of an expert's opinion depends upon (1) the validity of the underlying theory, (2) the validity of the technique used to apply that theory, and (3) the proper application of the technique on a particular occasion. Id.

{¶34} We have observed that in performing its "gate-keeping function," the trial court's starting point should be Evid.R. 702, which provides that a witness may testify as an expert if all of the following apply:

> (A) The witness' testimony either relates to matters beyond the knowledge or experience possessed by lay persons or dispels a misconception common among lay persons;
>
> (B) The witness is qualified as an expert by specialized knowledge, skill, experience, training, or education regarding the subject matter of the testimony;
>
> (C) The witness' testimony is based on reliable, scientific, technical, or other specialized information. To the extent that the

testimony reports the result of a procedure, test, or experiment, the testimony is reliable only if all of the following apply:

(1) The theory upon which the procedure, test, or experiment is based is objectively verifiable or is validly derived from widely accepted knowledge, facts, or principles;

(2) The design of the procedure, test, or experiment reliably implements the theory; and

(3) The particular procedure, test, or experiment was conducted in a way that will yield an accurate result.

*State v. Smith*, 5th Dist. Guernsey No. 2012-CA-17, 2013-Ohio-1226, ¶ 45, citing *Abon, Ltd. v. Transcontinental Ins. Co.,* 5th Dist. Richland No. 2004–CA–0029, 2005–Ohio–3052, internal citation omitted.

{¶35} The focus of a *Daubert* hearing is the reliability of the potential evidence. The hearing does not usurp the role of the finder of fact at trial. "A court resolving a reliability question should consider the 'principles and methods' the expert used 'in reaching his or her conclusions, rather than trying to determine whether the conclusions themselves are correct or credible.'" *State v. Nemeth,* 82 Ohio St.3d 202, 210, 1998-Ohio-376, 694 N.E.2d 1332; see also, *Miller v. Bike Athletic Co.*, 80 Ohio St.3d 607, 687 N.E.2d 735, paragraph one of the syllabus. As the *Daubert* court stated, in assessing reliability, '[t]he focus * * * must [generally] be * * * on principles and methodology, not on the conclusions that they generate.' *Daubert*, supra, 509 U.S. at 595.

{¶36} Before our discussion of the trial court's analysis of the expert testimony, we must note the term "shaken baby syndrome" is a term invoked by appellant and

defense trial counsel, and also by appellant in his brief.  Appellee's witnesses did not testify that the cause of A.G.'s injuries was "shaken baby syndrome." Instead, the witnesses, Steiner in particular, testified at trial that in 2009, the American Academy of Pediatrics issued a policy statement that the term "shaken baby syndrome" is misleading and should not be used because the term implies one mechanism of abuse (shaking) when in fact other types of trauma may have been involved.  On cross-examination, Steiner was asked directly "[i]s this shaken baby syndrome?" and he replied that this is an abusive head injury; specifically, this child received a traumatic brain injury that involved the mechanism of whiplash rotation of the head.  Our discussion infra addresses appellant's arguments regarding "shaken baby syndrome" even though the term is inexact under the circumstances.

{¶37} With these principles in mind, we turn to appellant's specific complaints about the *Daubert* hearing.

*Limitation of Cross-Examination*

{¶38} Appellant's first complaint is that the trial court did not allow defense trial counsel to sufficiently cross-examine Dr. Steiner as to whether his "shaken baby theories" are accepted in the scientific community.  The trial court outlined the topics that would be covered and personally questioned the witnesses at the hearing.  The trial court did not permit counsel to directly question Steiner about the error rate of "shaken baby" diagnoses, concluding this question was an issue for trial.

{¶39} Generally, the trial court has broad discretion in imposing limits on the scope of cross-examination. *State v. Green*, 66 Ohio St.3d 141, 147, 609 N.E.2d 1253 (1993); *State v. Cobb*, 81 Ohio App.3d 179, 183, 610 N.E.2d 1009 (9th Dist.1991). An appellate

court will not interfere with a trial court's decision about the scope of cross-examination absent an abuse of discretion. *In re Fugate*, 2nd Dist. Darke No. 1512, unreported (Sept. 22, 2000). The term abuse of discretion "connotes more than an error in * * * judgment; it implies that the court's attitude is unreasonable, arbitrary or unconscionable." *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219, 450 N.E.2d 1140 (1983).

{¶40} Cross-examination arises from the criminal defendant's right to confront witnesses. Appellant's complaint arose during a pretrial hearing. As appellee points out, the U.S. Supreme Court has emphasized "that the right to confrontation is a *trial* right, designed to prevent improper restrictions on the types of questions that defense counsel may ask during cross-examination." (Emphasis in original). *Pennsylvania v. Ritchie*, 480 U.S. 39, 52–53, 107 S.Ct. 989, 94 L.Ed.2d 40 (1987); *California v. Green,* 399 U.S. 149, 157, 90 S.Ct. 1930, 26 L.Ed.2d 489 (1970) ("[I]t is this literal right to 'confront' the witness at the time of trial that forms the core of the values furthered by the Confrontation Clause"); *Barber v. Page,* 390 U.S. 719, 725, 88 S.Ct. 1318, 20 L.Ed.2d 255 (1968) ("The right to confrontation is basically a trial right"). Appellant cites no authority in support of his contention that the trial court's limitation upon cross-examination during the pretrial *Daubert* hearing denied him due process.

{¶41} The inherent gatekeeping function of the trial court at a *Daubert* hearing further leads us to the conclusion that the trial court did not abuse its discretion in questioning the witnesses directly and limiting cross-examination. The trial court's role is not to approve or disapprove the theory at issue. "A trial court may not, therefore, exclude expert testimony simply because it disagrees with the expert's conclusions. Instead, if the expert followed methods and principles deemed valid by the discipline to reach his

opinion, the court should allow the testimony. *Valentine v. PPG Industries Inc.,* 158 Ohio App.3d 615, 628, 2004–Ohio–4521, 821 N.E.2d 580 (4th Dist.2001), ¶ 29. The testing of the credibility of the expert opinion is a matter for trial. "The traditional adversary process is then capable of weeding out those shaky opinions." Id.

{¶42} Our review of the record indicates the trial court inquired whether Steiner followed the methods and principles deemed valid by his discipline, but forestalled inquiry about controversy surrounding "shaken baby syndrome," deeming those questions appropriate for cross-examination at trial. We find no abuse of discretion in the trial court's limitation of cross-examination at the *Daubert* hearing.

*Validity of "Shaken Baby Syndrome" Theory*

{¶43} Appellant next argues "shaken baby syndrome" diagnosis generally is not sufficiently valid; Steiner's technique used to apply the theory was invalid; and Steiner improperly applied the technique in the treatment and diagnosis of A.G. We find, though, that the trial court properly focused on the "principles and methods" Steiner used in reaching his conclusions, and "did not try to determine whether the conclusions themselves are correct or credible." *Nemeth,* supra, 82 Ohio St.3d at 210.

{¶44} We further note that appellant's arguments regarding the validity of "shaken baby syndrome" are misplaced. While experts disagree about shaken baby syndrome, it remains an accepted theory in this state and others. *State v. Stein*, 5th Dist. Richland No. 13CA51, 2014-Ohio-222, ¶ 31, citing *State v. Milby*, 12th Dist. Warren No. CA2013-02-014, 2013-Ohio-4331, ¶ 27, citing *State v. Woodson,* 8th Dist. Cuyahoga No. 85727, 2005–Ohio–5691, at ¶ 49; *State v. Hendrex,* 11th Dist. Trumbull No. 2009–T–0091, 2010–Ohio–2820; and *Day v. State,* 2013 OK CR 8, 303 P.3d 291, 296, ¶ 7. The trial

court permitted the Daubert hearing in this case to test the reliability of Steiner's conclusions, but the theory remains generally accepted. In a case involving a similar injury and diagnosis, the First District Court of Appeals noted, "This was not the type of junk science that lacked the intellectual rigor required for the admission of expert opinion." *State v. Carr*, 1st Dist. Hamilton No. C-090109, 2010-Ohio-2764, ¶ 28. We find no "legitimate concern of scientific invalidity" regarding Steiner's opinion.

*Impeachment of Defense Expert*

{¶45} Finally, appellant argues the trial court permitted appellee to improperly impeach the defense expert, Dr. Uscinski. Appellee demonstrated Uscinski was censured by the American Association of Neurological Surgeons for testifying as an advocate instead of as an unbiased educator in cases involving shaken baby syndrome. We find this to be an appropriate line of inquiry pursuant to Evid.R. 616(A), which permits "[b]ias, prejudice, interest, or any motive to misrepresent [to] be shown to impeach the witness either by examination of the witness or by extrinsic evidence."

{¶46} Appellant's first assignment of error is overruled.

II.

{¶47} In his second assignment of error, appellant argues his conviction upon one count of child endangering pursuant to R.C. 2919.22(A)(E)(2)(c) is against the manifest weight and sufficiency of the evidence. We disagree.

{¶48} The legal concepts of sufficiency of the evidence and weight of the evidence are both quantitatively and qualitatively different. *State v. Thompkins*, 78 Ohio St.3d 380, 1997-Ohio-52, 678 N.E.2d 541, paragraph two of the syllabus. The standard of review

for a challenge to the sufficiency of the evidence is set forth in *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991) at paragraph two of the syllabus, in which the Ohio Supreme Court held, "An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt."

{¶49} In determining whether a conviction is against the manifest weight of the evidence, the court of appeals functions as the "thirteenth juror," and after "reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be overturned and a new trial ordered." *State v. Thompkins*, supra, 78 Ohio St.3d at 387. Reversing a conviction as being against the manifest weight of the evidence and ordering a new trial should be reserved for only the "exceptional case in which the evidence weighs heavily against the conviction." *Id.*

{¶50} The jury found appellant guilty upon Count II, child endangering pursuant to R.C. 2919.22(A)(E)(2)(c). That section states in pertinent part: "No person, who is the parent, guardian, custodian, person having custody or control, or person in loco parentis of a child under eighteen years of age or a mentally or physically handicapped child under twenty-one years of age, shall create a substantial risk to the health or safety of the child, by violating a duty of care, protection, or support. * * * *. (E)(1) Whoever violates this

section is guilty of endangering children.  (2) If the offender violates division (A) or (B)(1) of this section, endangering children is one of the following * * * :  (c) If the violation is a violation of division (A) of this section and results in serious physical harm to the child involved, a felony of the third degree[.]"

{¶51} Appellant implies the jury's verdict upon Count II is inconsistent with its verdict upon Count I, in which appellant was found not guilty of child endangering pursuant to R.C. 2919.22(B)(1)(E)(2)(d).  That section states in pertinent part: "No person shall do any of the following to a child under eighteen years of age or a mentally or physically handicapped child under twenty-one years of age: (1) Abuse the child; (E)(1) Whoever violates this section is guilty of endangering children. (2) If the offender violates division (A) or (B)(1) of this section, endangering children is one of the following, * * * : (d) If the violation is a violation of division (B)(1) of this section and results in serious physical harm to the child involved, a felony of the second degree."

{¶52} The difference between Counts I and II can be summarized as inflicting an abusive injury (section B) versus violating a duty of care (section A).  The former is a more serious offense in degree of penalty than the latter.  We find the verdicts are not inconsistent. The jury could reasonably have found appellant guilty of violating a duty of care, protection and support (Count II) but not guilty of committing an abusive act (Count I).

{¶53} Turning to appellant's conviction upon Count II, he argues that appellee did not establish breach of the duty of care or negligence.  (Brief, 8).  The mens rea for child endangering pursuant to R.C. 2919.22(A) is recklessness. Moreover, appellant presents us with no authority in support of his premise that a conviction pursuant to R.C.

2919.22(A) may only be supported where a defendant failed to seek medical care for a child.

{¶54} Our review of relevant authority convinces us that R.C. 2919.22(A) addresses a wider category of cases than those described by appellant in which a defendant fails to promptly seek medical attention for a child under his or her care. This section may also apply where a defendant has failed to protect the child from harm inflicted upon the child while in the defendant's care, even if the jury is not convinced the defendant personally inflicted the injury. Under R.C. 2919.22(A), appellee was required to prove beyond a reasonable doubt that (1) appellant was the parent, guardian, custodian, person having custody or control, or person *in loco parentis* of A.G., and (2) appellant recklessly violated a duty of protection, care or support imposed by law which created a substantial risk to A.G.'s health or safety. *State v. McGee*, 79 Ohio St.3d 193, 680 N.E.2d 975 (1997), syllabus. A "'[s]ubstantial risk' means a strong possibility, as contrasted with a remote or significant possibility, that a certain result may occur or that certain circumstances may exist." R.C. 2901.01(A)(8). "The existence of the culpable mental state of recklessness is an essential element of the crime of endangering children under R.C. 2919.22(A)." *McGee,* supra, 79 Ohio St.3d 193 at syllabus. A person acts recklessly when, with heedless indifference to the consequences, he perversely disregards a known risk that his conduct is likely to cause a certain result or is likely to be of a certain nature. R.C. 2901.22(C). A person is reckless with respect to circumstances when, with heedless indifference to the consequences, he perversely disregards a known risk that such circumstances are likely to exist. Id.

{¶55} It is not necessary to show an actual instance or pattern of physical abuse on the part of the accused in order to justify a conviction under R.C. 2919.22(A). *State v. Kamel,* 12 Ohio St.3d 306, 309, 466 N.E.2d 860 (1984). A parent has a clear duty imposed by law to protect his or her child from abuse and to care for the child's injuries. See *State v. Sammons*, 58 Ohio St.2d 460, 463, 391 N.E.2d 713 (1979), appeal dismissed, 444 U.S. 1008, 100 S.Ct. 655, 62 L.Ed.2d 637 (1980). It is an offense under R.C. 2919.22(A) when one fails, without excuse, to act in discharge of one's duty to protect one's child, where the result is a substantial risk to the child's health or safety. *Kamel,* supra, 12 Ohio St.3d at 309.

{¶56} Appellant does not contest the jury's findings that he was the person having custody or control of A.G or that A.G. sustained serious physical harm.  He argues simply that appellee presented no evidence that he breached a duty of care to A.G.  We find sufficient credible evidence appellant breached his duty to protect A.G.  According to appellee's evidence, A.G. was a healthy two-year-old at the time he was entrusted to appellant's care, although he had some developmental delays. A.G.'s doctors agreed he suffered one or more significant blunt force traumas to his head with a violent shaking or rotational component, resulting in injuries characteristic of inflicted head injury: significant subdural hematoma and retinal hemorrhages in both eyes. While in appellant's care, A.G. first exhibited symptoms of the injuries, including lethargy, an apparent seizure, and collapse.  Appellee's expert opined the injuries did not result from an accident or other non-accidental cause; Steiner unequivocally testified the injury resulted from an act of abuse.

{¶57} Based on the evidence, the jury could have reasonably inferred appellant recklessly failed to protect A.G. from serious physical harm while he was in his care. Ample evidence was presented to allow the jury to rationally find A.G.'s injuries occurred as the result of an intentional infliction of a significant force. The jury could further rationally infer that appellant, as the sole caregiver at the time A.G. became symptomatic, was the person responsible for A.G.'s injuries, and that appellant either inflicted the injury to A.G.'s head himself or failed to protect him from such injury. See, *State v. Brooks*, 10th Dist. Franklin No. 00AP-1440, 2001 WL 1117464, unreported (Sept. 25, 2001). The jury accordingly could have concluded appellant recklessly violated a duty of care to prevent serious harm to A.G. during the time he was in defendant's sole care. Id. Construed in favor of appellee, the evidence was sufficient to allow the jury to find beyond a reasonable doubt that defendant violated R.C. 2919.22(A).

{¶58} Appellant argues the testimony of his expert, Dr. Uscinski, indicated retinal hemorrhages and subdural hematoma could have been caused by accidental impact or a short-distance fall. Steiner specifically dismissed those possibilities and ruled out other potential conditions that could have caused the retinal or brain bleeding in A.G. As the trier of fact, the jury was required to determine the credibility of the witnesses and the weight to be accorded their testimony. *State v. DeHass,* 10 Ohio St.2d 230, 227 N.E.2d 212, at paragraph one of the syllabus. Moreover, "[a] conviction is not against the manifest weight of the evidence solely because the jury heard inconsistent testimony." *State v. Humphries*, 5th Dist. Stark No. 06CA00156, 2008-Ohio-388, ¶ 37, citing *State v. Kendall*, 10th District Franklin No. 00AP-1098, unreported (June 29, 2001). The jury could properly

believe Steiner's testimony that A.G.'s retinal hemorrhages and subdural hematoma were caused by a forcefully inflicted trauma, rather than an accidental trauma.

{¶59} Appellant offers no authority that a conviction pursuant to R.C. 2919.22(A) is not supported in a case in which the state's theory is the child's injuries resulted from violent forceful trauma while in the defendant's care.  The case law we have reviewed indicates that R.C. 2919.22(A) applies when a child is injured while in a defendant's care, rising to the level of an inexcusable failure to act in discharge of a duty to protect a child. See, e.g., State v. Humphries, 5th Dist. Stark No. 06CA00156, 2008-Ohio-388 [significant circumstantial evidence established child suffered from shaken baby syndrome; defendant failed to provide a reasonable explanation for child's injuries; defendant exhibited suspicious behavior both on the day child was admitted to the hospital and in the following days; defendant's account contained numerous inconsistencies; and expert testified that fall as described could not have caused the fatal injury, thus medical testimony and evidence demonstrate appellant created substantial risk of harm resulting in head injury]; State v. Cruz, 9th Dist. Lorain No. 99CA007411, 2000 WL 1026694, *2 (July 26, 2000) [defendant violated duty of care to child by shaking her violently]; State v. Calise, 9th Dist. Summit No. 26027, 2012-Ohio-4797, ¶¶ 5-7 [defendant was only adult with child when she suffered severe brain injuries, extensive expert medical testimony established injuries were the result of non-accidental trauma, and injuries could not possibly have occurred from simple fall defendant described]; State v. Swain, 4th Dist. Ross No. 01CA2591, 2002-Ohio-414 [defendant burned child's fingers, which he claimed was accidental]; State v. Scott, 3rd Dist. Hardin No. 6-07-17, 2008-Ohio-86, ¶ 22 [injuries occurred when only defendant had access to the child; jury could have disbelieved

defendant's explanation based upon expert testimony, and jury could have found defendant recklessly created a substantial risk of harm to child's health or safety by swinging him in forceful manner]; *State v. Flory,* 3d Dist. Van Wert No. 15-04-18, 2005-Ohio-2251, ¶ 7 [appellee's evidence established defendant's explanations of accidents did not explain extent of child's injuries, injuries were consistent with abuse, and reasonable juror could conclude defendant recklessly created substantial risk to health and safety of child by violating duty of care].

{¶60} Based upon the entire record in this matter, we find appellant's conviction is supported by ample sufficient evidence and is not against the manifest weight of the evidence. To the contrary, the jury appears to have fairly and impartially decided the matters before them because appellant was acquitted upon Count I. The jury as a trier of fact can reach different conclusions concerning the credibility of the testimony of the state's witnesses and the defendant's witnesses. See, *State v. Aeschilmann*, 5th Dist. Stark No. 2013CA00192, 2014-Ohio-4462, appeal not allowed sub nom*. State v. Aeschlimann*, 142 Ohio St.3d 1465, 2015-Ohio-1896, 30 N.E.3d 974. This Court will not disturb the jury's finding if it is supported by competent evidence. Id., citing *State v. Walker,* 55 Ohio St.2d 208, 378 N.E.2d 1049 (1978). The jury heard the witnesses, evaluated the evidence, and was convinced of appellant's guilt.

{¶61} Appellant's second assignment of error is overruled.

## CONCLUSION

{¶62} Appellant's two assignments of error are overruled and the judgment of the Stark County Court of Common Pleas is affirmed.

By:  Delaney, J. and

Wise, P.J.

Baldwin, J., concur.