[Cite as *State v. Milby*, 2013-Ohio-4331.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

WARREN COUNTY

STATE OF OHIO,                              :

    Plaintiff-Appellee,                    :            CASE NO.   CA2013-02-014

                                 :            O P I N I O N
  - vs -                                                                9/30/2013

                                   :

JASON W. MILBY,                            :

    Defendant-Appellant.               :

CRIMINAL APPEAL FROM WARREN COUNTY COURT OF COMMON PLEAS
Case No. 11CR27727

David P. Fornshell, Warren County Prosecuting Attorney, Michael Greer, 500 Justice Drive, Lebanon, Ohio 45036, for plaintiff-appellee

Gray & Duning, John C. Kaspar, 130 East Mulberry Street, Lebanon, Ohio 45036, for defendant-appellant

**HENDRICKSON, P.J.**

{¶ 1} Defendant-appellant, Jason W. Milby, appeals his conviction in the Warren County Common Pleas Court for felonious assault and endangering children, for which he was sentenced to eight years in prison. Appellant was charged with those offenses after the two-year-old child of a woman with whom he was living sustained a severe brain injury while under appellant's care that has left the child in a permanent vegetative state. For the

reasons that follow, we affirm appellant's conviction and sentence.

{¶ 2} Appellant was the live-in boyfriend of B.S.'s biological mother. The alleged victim, B.S., was two years old at the time of the incident in question and one of his mother's three children. Since both appellant and B.S.'s mother worked, B.S.'s mother watched the children in the morning; B.S.'s maternal grandmother watched the children in the afternoon; and appellant watched the children in the evening until B.S.'s mother returned home.

{¶ 3} On July 14, 2011, B.S.'s grandmother arrived at his mother's house at about 2:30 p.m. to watch the children. Sometime after B.S.'s mother left for work, his grandmother prepared snacks for the children. When B.S. was sitting on a chair in the kitchen eating his snack, he turned around to look at his siblings who were playing a video game. As he did, he got his legs caught on the legs of the kitchen table and fell off the chair, landing on his right side. B.S. did not cry after he fell, but instead, got back on the chair and finished eating his snack and drinking his milk. He then walked over to his sister, who was sitting on a nearby love seat, curled up next to her and fell asleep.

{¶ 4} Sometime after 6:00 p.m., appellant came home from work. B.S.'s grandmother told appellant to wake B.S. because she felt he had been sleeping too long and that might affect his ability to sleep at night. When B.S. woke up, he asked where his sister was, and B.S.'s grandmother told him she was outside playing with their brother. B.S. went outside and sat down by his sister on the backyard patio. B.S.'s grandmother allowed appellant to take a shower, and when he finished, she left at 6:50 p.m., leaving appellant to care for the three children. After B.S.'s grandmother left, the children continued to play outside, and appellant went outside to watch them. However, after about 15 to 20 minutes, appellant went inside to eat some dinner. He permitted B.S.'s older siblings to stay outside, but he made B.S. go inside with him because B.S. was mischievous and he did not want him to get into any trouble.

{¶ 5} At 8:05 p.m., appellant had a seven-minute cell phone conversation with B.S.'s mother, during which appellant expressed no concern about B.S.'s health. However, from 8:54 p.m. to 9:04 p.m., appellant sent text messages to B.S.'s mother, asking her to call. B.S.'s mother did not respond to these messages. At 9:15 p.m., appellant sent B.S.'s mother a text message that said B.S. was asleep on the floor but was not right. B.S.'s mother responded by sending appellant a message asking if B.S. was breathing. At 9:16 p.m., appellant called B.S.'s mother and had an 80-second conversation with her in which appellant told her that B.S. was still breathing but had thrown up. B.S.'s mother told appellant that if he was concerned, he should call B.S.'s grandmother, which he did at 9:21 p.m.

{¶ 6} B.S.'s grandmother rushed over to B.S.'s home. When she arrived, she immediately recognized that B.S. was in need of medical care, so she rushed him to a nearby urgent care facility and carried him inside. The urgent care physician made efforts to stabilize B.S., but realizing that she needed additional help, called 911. When the urgent care physician and emergency personnel realized B.S. needed even greater assistance, they had him CareFlighted to Dayton Children's Hospital. Upon his arrival, a CT scan was performed on B.S., which revealed that he had a subdural hemorrhage and severe cerebral edema. B.S. was rushed into surgery where a piece of his skull was removed in order to relieve the swelling and the blood.

{¶ 7} B.S. survived his initial injuries but they proved catastrophic. Nearly half his brain died and that portion of it had to be removed. As a result of his injuries, B.S. can no longer speak, walk, see or move himself. He must be fed through a gastric tube, transported by a wheelchair and take numerous medications to continue his bodily functions. He will require life-long medical care, and his chances of long-term survival have been significantly reduced.

{¶ 8}   Appellant was indicted for felonious assault in violation of R.C. 2903.11(A)(1) and endangering children in violation of R.C. 2919.22(B)(1), with both charges being felonies of the second degree.  Appellant's first trial ended in a mistrial after the jury deadlocked. However, a jury convicted appellant as charged in his second trial.  The trial court merged appellant's conviction for endangering children with his conviction for felonious assault and sentenced him to eight years in prison for felonious assault.

{¶ 9}   Appellant now appeals, assigning the following as error:

{¶ 10} Assignment of Error No. 1:

{¶ 11} APPELLANT WAS DEPRIVED OF HIS CONSTITUTIONAL RIGHT TO A FAIR TRIAL DUE TO INEFFECTIVE ASSISTANCE OF COUNSEL.

{¶ 12} Assignment of Error No. 2:

{¶ 13} THE JURY'S VERDICT IS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE AND NOT SUPPORTED BY SUFFICIENT EVIDENCE AS THE TRIAL COURT REVERSED THE BURDEN OF PROOF FROM THE STATE TO THE APPELLANT.

{¶ 14} Assignment of Error No. 3:

{¶ 15} THE TRIAL COURT COMMITTED REVERSIBLE ERROR BY DENYING APPELLANT'S MOTION IN LIMINE TO EXCLUDE THE STATE'S EXPERT TESTIMONY OR IN THE ALTERNATIVE FAILED TO CONDUCT A HEARING ABOUT THE RELIABILITY OF THE EXPERT TESTIMONY UNDER DAUBERT.

{¶ 16} We shall discuss appellant's assignments of error in a slightly different order than the one in which he has presented them, in order to facilitate our analysis of the issues raised in this appeal.

{¶ 17} In his first assignment of error, appellant argues he was denied his constitutional right to effective assistance of counsel because his trial counsel failed to formally request that the state provide the defense with its expert witnesses' reports in

previous cases in which they provided expert testimony. We disagree with this argument.

{¶ 18} To establish a claim of ineffective assistance of counsel, a defendant must show that his trial counsel's representation fell below an objective standard of reasonableness and that there exists a reasonable probability that, but for counsel's errors, the outcome of the proceeding would have been different. *Strickland v. Washington,* 466 U.S. 668, 687-688, 104 S.Ct. 2052 (1984). A "reasonable probability" is "a probability sufficient to undermine confidence in the outcome of the proceeding." *Id.* at 694.

{¶ 19} The state presented testimony from three medical experts to prove its charges against appellant: (1) Dr. Laurence Kleiner, M.D., a pediatric neurosurgeon, who performed the surgery on B.S. that saved his life; (2) Dr. Lori Vavul-Roediger, M.D., who is a child abuse pediatrician; and (3) Dr. Rendell Alexander, M.D., who is also a child abuse pediatrician and who is an expert on shaken baby syndrome (SBS) or abusive head trauma (AHT).

{¶ 20} In support of his ineffective-assistance argument, appellant notes that, in this case, Dr. Alexander testified that retinal hemorrhaging occurs in 80% to 90% of SBS cases, but that, in a 1997 case, he testified that, "when we talk about definitions of [SBS], the retinal hemorrhages we see 90% of the time, 95% of the time (and) once in a while we don't see retinal hemorrhages on a shaken baby[.] But on a severe case you will undoubtedly see them." Appellant notes that, in this case, Dr. Alexander acknowledged during his testimony that there were no signs of retinal hemorrhaging in B.S. even though he had classified B.S.'s case as severe. Appellant further notes that when this inconsistency was brought to his attention, Dr. Alexander altered his testimony by stating that B.S.'s case was "moderately severe." Appellant asserts that "[t]his one instance demonstrates how vitally important prior expert reports are in impeaching an expert witness." We find this argument unpersuasive.

{¶ 21} Appellant is asking this court to infer from this one example that his trial counsel would have found a substantial number of significant conflicts between Dr. Alexander's

expert testimony in this case and his expert testimony in past cases if counsel had formally requested that the state provide him with Dr. Alexander's past expert reports. However, the inference he is requesting this court to draw amounts to mere speculation. Moreover, when Dr. Alexander modified his testimony by describing B.S.'s case as "moderately severe," after having initially described it as "severe," Dr. Alexander added, "I mean [B.S.] didn't die, and so I call those severe cases. But I would say this is pretty serious[.]"

{¶ 22} We also disagree with appellant's argument that his trial counsel provided him with ineffective assistance by failing to effectively cross-examine Dr. Alexander on the topic of "lucid interval." The defense argued at trial that B.S.'s injury was caused when he fell from a 17-inch chair, and that while B.S. initially appeared to be unhurt from this fall, this was because he experienced a lucid interval between the time he fell and the time at which the true extent of his brain injury became evident. However, appellant has failed to present any persuasive argument as to how his defense counsel could have cross-examined Dr. Alexander more effectively on the topic of lucid interval. Instead, he merely cites, once again, defense counsel's failure to formally ask for the state's medical experts' past reports. However, we have already determined that this alleged performance error cannot establish an ineffective-assistance claim because it amounts to mere speculation.

{¶ 23} Furthermore, all three of the state's medical experts disagreed with the defense theory that B.S. experienced a lucid interval after he sustained his injuries. The state's medical experts opined that B.S.'s fall from the kitchen chair could not have caused his severe injuries, and that, due to the severity of his injuries, B.S. would not have experienced any lucid interval after those injuries were inflicted. Appellant's claim that B.S. experienced a lucid interval after he fell from the kitchen chair was further undermined by evidence that appellant told the police that, after B.S. fell from the chair but before the full extent of his injury became apparent, B.S. rode on his tricycle "around 90 miles per hour."

{¶ 24} Appellant also argues his trial counsel was ineffective because he could not find a scholarly text with which Dr. Alexander was familiar, in order to effectively impeach him on the topic of lucid interval. However, this alleged failure also fails to demonstrate that he was deprived of effective assistance because it, too, is speculative and fails to show a "reasonable probability" of a different outcome, i.e., "a probability sufficient to undermine confidence in the outcome of the proceeding." *Strickland,* 466 U.S. at 694.

{¶ 25} Therefore, appellant's first assignment of error is overruled.

{¶ 26} In his third assignment of error, appellant argues the trial court erred by denying his motion in limine to exclude the state's expert testimony regarding SBS or AHT, or, in the alternative, by refusing to conduct a Daubert hearing about the reliability of expert testimony regarding SBS or AHT. He asserts that the theory of SBS or AHT has fallen out of favor with medical experts in this country over the last ten years, and therefore the trial court should have prohibited the state's experts from testifying about it, *or*, at least, should have held a Daubert hearing so that it could make an informed ruling on the reliability of such testimony. In support of this assertion, appellant relies on one appellate court case from another state, *State v. Edmunds*, 308 Wis.2d 374 (2007), and a number of law review articles as well as other scholarly articles.[1] We find this argument unpersuasive.

{¶ 27} While there are experts who disagree about SBS, it remains an accepted theory in this state and others. *See, e.g., Woodson*, 8th Dist. Cuyahoga No. 85727, 2005-Ohio-5691, at ¶ 49; *Hendrex*, 11th Dist. Trumbull No. 2009-T-0091, 2010-Ohio-2820; and *Day v. State*, 2013 OK CR 8, 303 P.3d 291, 296, ¶ 7.

---

1. The articles cited by appellant include, Keith A. Findley, et al., *Shaken Baby Syndrome, Abusive Head Trauma, and Actual Innocence: Getting it Right*, 12 Hous. J. Health L. & Pol'y 230 (2012), and Deborah Tuerkheimer, *The Next Innocence Project: Shaken Baby Syndrome and The Criminal Courts*, 87 Wash. U.L. Rev. 1 (2009).

{¶ 28} In rejecting a claim similar to the one appellant is raising here, the *Day* court stated:

> [Appellant] claims that, even if we previously accepted the evidence [of SBS], it is no longer reliable under *Daubert* [*v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786 (1993)] because it has been discredited by other scientific evidence. This is an exaggeration. The most the record before us shows is that experts disagree on the diagnosis of Shaken Baby Syndrome (SBS), particularly where there is no evidence of some impact injury. This disagreement is vigorous. However, neither the testimony at trial nor the references [appellant] cites support a conclusion that the theory of abusive head trauma, or SBS, has been discredited. Expert testimony is not rendered unreliable by criticism. *Harris v. State,* 2004 OK CR 1, ¶ 31 n. 10, 84 P.3d 731, 746 n. 10. [Appellant's] jury determined the weight and credibility to give to each witness. *Warner* [*v. State*], 2006 OK CR 40, ¶ 40, 144 P.3d at 863. Jurors had the benefit of hearing "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof." *Daubert,* 509 U.S. at 596, 113 S.Ct. at 2798.

*Day* at ¶ 8. The *Day* court also found that the trial court did not abuse its discretion in refusing to hold a Daubert hearing, because the knowledge involving SBS or AHT has long been recognized as the proper subject of expert testimony, the testimony is not novel, and therefore no Daubert hearing was necessary. *Id.* ¶ at 4-6.

{¶ 29} We find the reasoning in *Day* to be persuasive. Therefore, we conclude that the trial court did not err in denying appellant's request to exclude the state's expert testimony on SBS or AHT, nor did it abuse its discretion in refusing to conduct a Daubert hearing on the reliability of such expert testimony.

{¶ 30} Consequently, appellant's third assignment of error is overruled.

{¶ 31} In his second assignment of error, appellant asserts that the jury's verdict is not supported by sufficient evidence and is against the manifest weight of the evidence. We disagree with this argument.

{¶ 32} Dr. Kleiner testified, within a reasonable degree of medical certainty, that B.S.

sustained a subdural hematoma and severe edema that was of an acute, rather than chronic, nature. He testified that the subdural hematoma was caused when the bridging veins in B.S.'s skull were torn by an "acceleration/deceleration injury" in which there was "some kind of acceleration of the skull[,]" followed by a "whipping or torque," which then came "to an abrupt stop." He testified that, once B.S. received the injury, he would not have been able to engage in any normal activity. He opined that B.S.'s injury was the result of AHT.

{¶ 33} Dr. Vavul-Roediger and Dr. Alexander agreed with Dr. Kleiner's diagnosis, including his assessment that B.S.'s injuries were caused by AHT. Dr. Vavul-Roediger noted that B.S. had several bruises on his body at the time he was brought in, including two bruises on the very low bottom portion of his back near his buttocks and a two-centimeter area of bruising just to the side of his anus.

{¶ 34} In addition to the testimony of its medical experts, the state presented evidence showing that at least 20 minutes elapsed between the time appellant first saw B.S. lying on the floor, not looking "right," and the time he summoned B.S.'s grandmother for assistance. The state also presented a taped telephone conversation between appellant and B.S.'s mother that took place while appellant was in jail awaiting trial, in which appellant told B.S.'s mother that he was considering accepting the state's plea bargain offer:

[Appellant]: * * * It's about to end here real soon.

[B.S.'s Mother]: Really. What are you going to do?

* * *

[Appellant]: I don't know.
[B.S.'s Mother]: S___. What are you going to do?

[Appellant]: I don't know.

[B.S.'s Mother]: Then why do you say stupid s___ like that?

* * *

[Appellant]: I'm ready to go. I'm serious. Ten, fifteen, thirty, whatever, let's do it. That's what I meant.

[B.S.'s Mother]: Really?

[Appellant]: Yeah. I'm half-tempted to make the phone call.

[B.S.'s Mother]: To who? [Sic.]

[Appellant]: (inaudible) f____ deal (inaudible) getting ready to go. I woke up all night sweating. My heart was beating (inaudible).

[B.S.'s Mother]: So you rather not take it to trial and just go to prison and say f____ it?

[Appellant]: If I'm going to go (inaudible).

[B.S.'s Mother]: Really?

[Appellant]: Why should I sit here? (inaudible) going on, so that's what's going to happen, because *I done did it.* I dreamed everything, you know, everything that happened. That's why I am wasting even more (inaudible) because I dreamed that that m_____ f____. I mean for me - - you don't know how it is.

[B.S.'s Mother]: No, I don't know how it is in there, but I know I don't - - you know, we have wasted $25,000 for you to say hey I'm just going to go to prison for 30 years and say f____ it.

[Appellant]: That's not what I want.

[B.S.'s Mother]: Well, you're sitting here talking like you're just going to make a deal and get it over and f_____ done with. Baby, if that's what you want to do, then I will go tell [your attorney] to give the f_____ money back and go do it then. If you want to be an a__ like that.

(Emphasis added.)

{¶ 35} When B.S.'s mother was recalled to the stand on rebuttal, she testified that

when appellant said, "I done did it[,]" he was only talking about a dream he had in which he had been killed in prison. However, as the prosecutor noted during closing argument, B.S.'s mother's explanation that appellant was merely talking about a dream does not account for his seriously considering accepting the state's plea bargain offer that would have required him to serve a lengthy prison sentence in order to avoid trial.

{¶ 36} The defense tried to counter the state's evidence with expert testimony from Dr. Leon Kazarian, an expert in "biomechanics," which Dr. Kazarian defines as "the application of engineering principles to the human body." Dr. Kazarian opined that B.S.'s injuries were caused by his fall from the chair in the kitchen while he was under B.S.'s grandmother's care. Dr. Kazarian estimated B.S.'s fall to have been from "three-plus feet." Dr. Kazarian acknowledged that the chair's seat is 17 inches from the ground. However, he testified that B.S.'s fall was from a distance of more than 17 inches because B.S. was in a seated position on the kitchen chair, and therefore his head would have been "three-plus feet" away from the floor at the time he fell from the chair. Dr. Kazarian further testified that B.S.'s injury was consistent with a fall from the kitchen chair in which B.S. was "locking his feet on the table leg, spinning around and hitting the floor on that carpet, on the cement floor underneath[.]" Additionally, appellant's counsel suggested during closing argument that the evidence presented showed that B.S.'s injury may have been caused when he tried to jump from a dresser to a bed in one of the bedrooms in his home.

{¶ 37} The jury was entitled to believe the state's witnesses and disbelieve the defense's theory of the case. *See State v. Coleman*, 12th Dist. Butler No. CA2010-12-329, 2011-Ohio-4564, ¶ 26 (a jury may believe all, part or none of a witness' testimony and may base its decision on circumstantial evidence). We conclude that the state presented ample evidence to convict appellant on every element of felonious assault in violation of R.C. 2903.11(A)(1) and endangering children in violation of R.C. 2919.22(B)(1) and that the jury

did not lose its way in finding him guilty of those offenses. *State v. Williams*, 12th Dist. Warren No. CA2012-08-080, 2013-Ohio-3410, ¶ 29-30.

{¶ 38} Appellant argues that, by allowing the state to present expert testimony regarding SBS or AHT, the trial court reversed the burden of proof in this case by essentially forcing him to prove that he did not cause B.S.'s injuries. He also objects to the fact that the state proved its case against him with circumstantial evidence. We find these arguments unpersuasive.

{¶ 39} "Circumstantial evidence and direct evidence inherently possess the same probative value. In some instances certain facts can only be established by circumstantial evidence." *State v. Jenks*, 61 Ohio St.3d 259, 272 (1991). Appellate courts in this state have upheld convictions obtained through the use of expert testimony regarding SBS or AHT. *See, e.g., State v. Woodson*, 8th Dist. Cuyahoga No. 85727, 2005-Ohio-5691, ¶ 53. *See also, State v. Hendrex*, 11th Dist. Trumbull No. 2009-T-0091, 2010-Ohio-2820, ¶ 40-41. "'[I]t is not unusual that evidence of shaken baby syndrome may be primarily circumstantial, especially where a child is in the sole custody of one adult at the time the injuries are sustained.'" *Woodson* at ¶ 53, quoting *State v. Brooks*, 10th Dist. Franklin No. 00AP-1440, 2001 WL 1117464 (Sept. 25, 2001). *See also Hendrex* (quoting *Woodson*).

{¶ 40} Appellant argues that Dr. Kleiner's testimony shows how weak the state's case was. However, Dr. Kleiner's testimony was corroborated by that of Dr. Vavul-Roediger and Dr. Alexander. Additionally, appellant's argument ignores the evidence regarding the extent of B.S.'s injuries. Simply put, the injuries B.S. sustained are too severe for the explanations offered by the defense. When Dr. Kleiner's testimony is looked at in conjunction with that of the state's other evidence, it is clear that the state presented a very compelling case against appellant.

{¶ 41} Appellant also contends that the state's bill of particulars and amended bill of

particulars failed to provide a reasonable amount of specificity describing the factual basis of the offenses with which he was charged. We find this argument unpersuasive.

{¶ 42} Crim.R. 7(E) requires the state to provide the defendant with a bill of particulars, upon the defendant's request, that specifically sets forth the nature of the offense charged and the conduct of the defendant that is alleged to constitute the offense. Crim.R. 7(E) also provides that a "bill of particulars may be amended at any time subject to such conditions as justice requires."

{¶ 43} Prior to the first trial held in this case, the state provided appellant with a bill of particulars that stated, "[o]n or about July 14, 2011, between 6:30 p.m. and 9:30 p.m. * * *, the Defendant did knowingly cause serious physical harm, to wit: traumatic brain injury, to minor, B.S., age 2 and/or recklessly abuse Minor B.S. in that it resulted in serious physical harm to Minor B.S., to wit: traumatic brain injury."

{¶ 44} Appellant moved for a more definite and certain bill of particulars as to the "mechanism of injury" that sets forth "whether this is a 'shaken baby' case, a 'direct blow(s)' case or a 'fall' case, or some combination of the three." The state responded by filing an amended bill of particulars that stated, "[o]n or about July 14, 2011, between approximately 6:30 p.m. and 9:30 p.m., the Defendant did knowingly cause serious physical harm, to wit: traumatic brain injury, to minor, B.S., age 2 and/or recklessly abuse Minor B.S. by means of shaking, shaking and impact and/or mechanisms unknown, in that it resulted in serious physical harm to Minor B.S., to wit: traumatic brain injury."

{¶ 45} We conclude that the state provided sufficient information in its initial and amended bill of particulars to comply with Crim.R. 7(E), because the information contained therein was adequate to inform appellant of the conduct that led to the charges against him and to enable him to defend against those charges.

{¶ 46} Accordingly, appellant's second assignment of error is overruled.

{¶ **47**} Judgment affirmed.


S. POWELL and PIPER, JJ., concur.