[Cite as *State v. Cherry*, 2025-Ohio-5802.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

WARREN COUNTY


STATE OF OHIO,                                     :

    Appellee,                                      :          CASE NO. CA2024-09-063

    - vs -                                         :          <u>OPINION AND</u>
                                                             <u>JUDGMENT ENTRY</u>
                                                   :          12/30/2025

JUSTIN MATTHEW CHERRY,                             :

    Appellant.                                     :


CRIMINAL APPEAL FROM WARREN COUNTY COURT OF COMMON PLEAS
Case No. 24CR41622


David P. Fornshell, Warren County Prosecuting Attorney, and Kirsten A. Brandt, Assistant Prosecuting Attorney, for appellee.

Engel & Martin, LLC, and Joshua A. Engel, for appellant


# **O P I N I O N**


**BYRNE, J.**

{¶ 1}  Justin Matthew Cherry appeals from his conviction in the Warren County Court of Common Pleas for aggravated burglary. For the reasons discussed below, we affirm.

## I. Factual and Procedural Background

{¶ 2}   In April 2024, a Warren County grand jury returned an indictment charging Cherry with one count of aggravated burglary. The indictment arose after Cherry allegedly entered a Springboro residence uninvited while possessing a large knife. The State specifically alleged that, in the early morning hours of April 2, 2024, while the homeowners were asleep in their bedroom, Cherry entered 40 Thistledown Lane through an open garage door and consumed various items from the homeowners' pantry.[1]

{¶ 3}   Cherry pleaded not guilty to the charge and subsequently waived his right to a jury trial. The matter proceeded to a bench trial on August 6, 2024. At trial, the State presented testimony from the homeowner of 40 Thistledown Lane and three of the law enforcement officers who investigated the incident. Cherry did not present any witnesses. We have summarized the relevant testimony below.

### A. Testimony at the Bench Trial

### 1. Thomas Hunsaker's Testimony

{¶ 4}   Thomas Hunsaker testified that he is 70 years old and lives at 40 Thistledown Lane in Springboro, Ohio ("the Hunsaker Residence") with his wife, Teresa. The Hunsaker Residence is a tri-level home with an attached four-car garage and traditional driveway out front. The garage is separated into two distinct parts, a "front garage" and a "back garage," which are connected by a breezeway large enough to drive a vehicle through. The Hunsakers park two vehicles in the front garage, while a third vehicle and tools are stored in the back garage. The garage has standard garage door entrances to the front and back garages, and both garages are accessible to the interior

---

1. We note that, arising from the same chain of events, Cherry was charged with aggravated possession of drugs in a separate case in the trial court, case number 24CR41737. Prior to the trial in the instant matter, Cherry pleaded guilty to that charge and was later sentenced to a prison term that was ordered concurrent with the sentence he received in this case. Cherry does not raise any argument pertaining to his conviction and sentence in case number 24CR41737.

of the residence through doors located inside the garage.

{¶ 5} The Hunsaker Residence is surveilled by multiple home security devices, including a Ring doorbell camera near the front door. Thomas testified that the Ring doorbell camera is triggered by motion within a certain range. That range includes a majority of the residence's driveway and front yard. In addition to the Ring doorbell camera, the Hunsaker Residence has a motion sensor camera in the back garage, as well as a motion sensor in the living room. Thomas also placed "contact sensors" on various doors in the home, including the doors to the front and back garage. The contact sensors notify Thomas when those doors are opened or closed.

{¶ 6} Thomas then described the events leading to Cherry's indictment. According to Thomas, on the evening of April 1, 2024, he and Teresa went to bed around 10:00 p.m. The couple's bedroom is located on the upper level of the Hunsaker Residence, which is one level above the home's living room, garage, pantry, and half-bathroom. Thomas awoke at approximately 6:00 a.m. on April 2, 2024, and noticed he had a notification from the security camera in the back garage. The security camera footage showed an unknown man, later identified as Cherry, in the back garage of the Hunsaker Residence at 2:57 a.m. on April 2. From the video, Thomas observed "something large" in Cherry's back pocket, which Thomas feared was a weapon. A copy of the security camera footage was played at trial and admitted into evidence.

{¶ 7} After watching the security camera footage, Thomas "panicked," grabbed his firearm, and walked downstairs to investigate. While en route to the back garage, Thomas noticed the door to the half-bathroom and pantry was closed, which was unusual. After reaching the garage, Thomas discovered the door to the front garage was open. Thomas could not recall whether he had closed the garage door the night before, but stated it was "more than likely" that either he or Teresa "left the door open," as they had

done on other occasions. Thomas did not believe anything was removed or taken from the garage.

{¶ 8}   After determining no one was in the garage, Thomas proceeded to check the conjoined bathroom and pantry area. Upon opening the door to that area, Thomas could tell someone had been there because certain items had been moved, including a step stool, and he smelled body odor and cigarette smoke. Thomas observed an open Gatorade bottle on the floor, which had been partially consumed, and saw the trash can lid was open. Thomas stated that the Hunsakers kept a few bottles of Gatorade on the pantry shelf, but they did not typically drink Gatorade. Upon further investigation, Thomas realized some items in the pantry had been eaten, others had been moved, and there were wrappers in the trash from food that neither he nor Teresa had eaten. Thomas testified that he and his wife purchased the items that had been consumed, and estimated their value as "more than zero," likely a "couple of bucks."

{¶ 9}   After confirming no intruders were in the home, Thomas called the police. While waiting for law enforcement to arrive, Thomas reviewed the security system's notifications from the night before, including notifications from the various motion detectors and contact sensors throughout the home. A document detailing those notifications was admitted into evidence at trial and confirmed there was motion inside the Hunsaker Residence while Thomas and Teresa slept.

{¶ 10} According to Thomas, the Ring doorbell camera did not register anyone coming to his front door or driveway that evening. This led Thomas to the conclusion that someone entered the garage from a "blind spot" to the left of the front garage. The security system alerted that at 3:24 a.m., the door to the interior of the home from the front garage was opened and then closed. Thereafter, at 4:53 a.m., the motion detector covering the Hunsakers' living room detected motion, leading Thomas to believe someone came into

his home from the garage and walked through the living room while he and his wife slept. Then, at 4:59 a.m., the door to the front garage was opened and closed a second time.

{¶ 11} On cross-examination, Thomas acknowledged that the Hunsakers have valuable property inside their home and in their garage, but did not notice anything missing aside from the Gatorade and food items. Thomas further confirmed that he did not know Cherry, had never met Cherry prior to April 2, 2024, and that Cherry did not have permission to be in his home or to consume his food and beverages.

### 2. Officer Antwaun Scott's Testimony

{¶ 12} Officer Antwaun Scott with the City of Springboro Police Department testified that on April 2, 2024 he responded to a suspected burglary at the Hunsaker Residence. Upon arriving, the officer took Thomas' statement and reviewed the security camera footage. Officer Scott testified that the video showed a white male walking aimlessly around the Hunsakers' garage with a large knife secured on his belt.

{¶ 13} In an effort to identify the man in the video, Officer Scott shared the video with his colleagues. At that point, several officers in the department identified the man in the video as Cherry and revealed to Officer Scott that Cherry was involved in a different police matter just days before, during which he was wearing the same clothing as the man in video and carried the same knife in the same position.

{¶ 14} After conferring with his fellow officers, Officer Scott learned that Cherry lived at 65 Eleanor Drive in Springboro, Ohio, a home located 0.3 miles from the Hunsaker Residence. Officers attempted to make contact with Cherry at 65 Eleanor Drive at approximately 10:00 a.m. on April 2. Upon arriving, the officers noticed the garage door to the home was open and that several vehicles were parked in the driveway. In one of those vehicles, officers discovered a woman, Brooke Goodman, sleeping. After waking, Brooke disclosed to the officers that Cherry was inside the home. Brooke then escorted

the officers into the home, where they located Cherry sleeping on a couch in the living room. Officer Scott identified Cherry at trial, and confirmed Cherry was the man he discovered sleeping on the couch that morning at 65 Eleanor Drive.

{¶ 15} After confirming Cherry was the man in the security camera footage from the Hunsakers' garage, Officer Scott placed Cherry under arrest for burglary. At that point, Cherry did not deny the burglary allegation and eventually agreed to speak with a detective without counsel. Officer Scott escorted Cherry to the police station while other officers conducted a search of 65 Eleanor Drive. A video recording of Officer Scott's body camera footage, which recorded the above interactions with Cherry at 65 Eleanor Drive, was played during trial and admitted into evidence.

### 3. Detective Dustin Hogan's Testimony

{¶ 16} Detective Dustin Hogan with the City of Springboro Police Department testified that he interviewed Cherry on April 2, 2024. A video recording of the interview was played during Detective Hogan's testimony and admitted into evidence. During the interview, Cherry initially claimed that he was at a friend's house until 11:30 p.m. on April 1, 2024. After leaving his friend's house, Cherry stated he walked home and went directly to bed. Later in the interview, Cherry "suddenly" became "very emotional," changed his story, and commented that he "didn't even know how [he] got" to the Hunsaker Residence. In summarizing Cherry's interview, the detective testified that "[Cherry] was at a friend's house . . . he had ate some marijuana edibles at some point during that visit with the friend. And then he went home or was going to walk home and had woke up in a garage and did not realize how he ended up in that garage." Cherry denied using any drugs aside from the marijuana edibles and specifically denied using methamphetamine that night.

{¶ 17} During the interview, Cherry described a pocketknife he carries on his belt.

Officers located the knife in a bedroom at 65 Eleanor Drive. Cherry also provided a DNA swab, which officers used to determine whether Cherry's DNA existed on the Gatorade bottle left at the Hunsaker Residence. After testing by the Bureau of Criminal Investigation, a DNA profile consistent with Cherry's was located on the mouth area of the interior cap of the Gatorade bottle. The estimated frequency of occurrence of the DNA profile was rarer than one in one trillion unrelated individuals.

**4. Detective Joshua Emmel's Testimony**

{¶ 18} Detective Joshual Emmel with the City of Springboro Police Department testified that he investigated a burglary at the Hunsaker Residence on the morning of April 2, 2024. As part of his investigation, Detective Emmel executed a search warrant at 65 Eleanor Drive. During the search, Detective Emmel discovered the knife that Cherry described in Brooke's bedroom. The detective disagreed that the knife was a "pocketknife" and described the knife as a fixed blade knife, with an approximately four-inch blade. Detective Emmel testified the knife was capable of inflicting death on a person.

{¶ 19} During the investigation, the detective took photographs of the scene. Several photographs were admitted into evidence, including some that depicted the exteriors of 65 Eleanor Drive and the Hunsaker Residence. The detective described some of the differences between the two exteriors, including that (1) the driveway and garage to the Hunsaker Residence are on the left side of the house while the garage at 65 Eleanor Drive is on the right side of the house; (2) the garage door to the Hunsaker Residence is on the front of the house while the garage door to 65 Eleanor Drive is on the side of the house; (3) the driveway at the Hunsaker Residence was empty, while multiple vehicles were parked in the driveway at 65 Eleanor Drive; (4) the home at 65 Eleanor Drive had no vehicles in the garage, nor any ability to put any vehicles in the garage. The State also introduced several photographs depicting the cluttered and

unkempt nature of the home and garage of 65 Eleanor Drive, as well as the orderly nature of the Hunsaker Residence.

{¶ 20} Detective Emmel further testified regarding a letter dated July 6, 2024, that Cherry wrote to "the prosecutor."[2] In the letter, Cherry sought to "explain what happen[ed] that night," and claimed he had been up for five days on methamphetamine. In an attempt to come "down from [his] high," Cherry wrote that he consumed THC edibles, Xanax, and beer on the night of the incident. Cherry also claimed he could barely walk at the time he left his friend's house and that he had just moved to the neighborhood. Although Cherry claimed he "thought" he walked home that night, he later acknowledged that he went to the Hunsaker Residence and ate a couple of candy bars. Detective Emmel testified that many of Cherry's statements in the letter contradicted statements Cherry made in his interview with Detective Hogan, during which Cherry denied using any drugs aside from marijuana and stated he had lived in the neighborhood for two or three months.

## B. Verdict and Sentencing

{¶ 21} Upon hearing the testimony and evidence presented, and following the conclusion of the parties' closing arguments, the trial court issued its verdict from the bench finding Cherry guilty of aggravated burglary. In so doing, the trial court stated, in pertinent part, the following:

> Somewhat outside the evidence here, we have an individual who has had a drug problem for pretty much as long as I've been here, which is 15 years . . . He's charged with aggravated burglary . . . It's difficult to determine why he entered these premises. So basically I have to look at the circumstantial evidence in the case. He was looking around in that garage just observing. Never took anything. And maybe he never intended to take anything. But then he took a step further and he opens the door of the main residence, enters the main residence and decides to help himself to snacks

---

2. Cherry's letter, which was admitted into evidence as Exhibit 64, is specifically addressed to the assistant prosecuting attorney involved with Cherry's case.

basically. But it's a theft offense. You can't excuse it by him being totally out of it . . . At some point in time you have to come to grips that addiction, even with no real intent, is going to lead to a bad result. And that's what we have here.

{¶ 22} The matter proceeded to a sentencing hearing on September 18, 2024. At the hearing, the trial court again noted Cherry's criminal history and substance abuse issues before imposing an indefinite prison term of four to six years.

{¶ 23} Cherry appealed.

## II. Law and Analysis

{¶ 24} On appeal, Cherry raises two assignments of error, which we will analyze collectively.

{¶ 25} Cherry's Assignment of Error No. 1 states:

THE CONVICTION IN THIS MATTER WAS UNSUPPORTED BY SUFFICIENT EVIDENCE.

{¶ 26} Cherry's Assignment of Error No. 2 states:

THE CONVICTION IN THIS MATTER WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

{¶ 27} Cherry challenges the sufficiency and weight of the evidence supporting his conviction based on the argument that the State failed to prove that he acted with the requisite intent.

### A. Applicable Law: Sufficiency and Manifest Weight of the Evidence

{¶ 28} "When reviewing the sufficiency of the evidence underlying a conviction, an appellate court examines the evidence to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt." *State v. Madden*, 2024-Ohio-2851, ¶ 31 (12th Dist.), citing *State v. Paul*, 2012-Ohio-3205, ¶ 9 (12th Dist.). Therefore, "[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the

essential elements of the crime proven beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus.

{¶ 29} "A manifest weight of the evidence challenge examines the 'inclination of the greater amount of credible evidence, offered at a trial, to support one side of the issue rather than the other.'" *Madden* at ¶ 32, quoting *State v. Barnett*, 2012-Ohio-2372, ¶ 14 (12th Dist.). "To determine whether a conviction is against the manifest weight of the evidence, the reviewing court must look at the entire record, weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether in resolving the conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed, and a new trial ordered." *Madden* at ¶ 32, citing *State v. Graham*, 2009-Ohio-2814, ¶ 66 (12th Dist.).

{¶ 30} In reviewing the evidence, an appellate court must be mindful that the original trier of fact was in the best position to judge the credibility of witnesses and determine the weight to be given to the evidence. *State v. Blankenburg*, 2012-Ohio-1289, ¶ 114 (12th Dist.). An appellate court will overturn a conviction due to the manifest weight of the evidence only in the exceptional case in which the evidence weighs heavily against the conviction. *State v. Zitney*, 2021-Ohio-466, ¶ 15 (12th Dist.).

{¶ 31} "Although the legal concepts of sufficiency of the evidence and weight of the evidence are both quantitatively and qualitatively different, '[a] determination that a conviction is supported by the manifest weight of the evidence will also be dispositive of the issue of sufficiency.'" *State v. Billingsley*, 2020-Ohio-2673, ¶ 15 (12th Dist.), quoting *State v. Jones*, 2013-Ohio-150, ¶ 19 (12th Dist.).

**B. Analysis**

{¶ 32} The trial court convicted Cherry of aggravated burglary in violation of R.C. 2911.11(A)(2). That statute provides, in relevant part, that,

No person, by force, stealth, or deception, shall trespass in an occupied structure . . . when another person other than an accomplice of the offender is present, with purpose to commit in the structure . . . any criminal offense, if . . . the offender has a deadly weapon or dangerous ordnance on or about the offender's person or under the offender's control.

R.C. 2911.11(A)(2).

{¶ 33} The definition of "aggravated burglary" requires that an offender "trespass" in an occupied structure. *State v. Maloney*, 2023-Ohio-2711, ¶ 44 (12th Dist.), citing R.C. 2911.21(A)(2). The offense of criminal "trespass," as pertinent here, is defined as "[n]o person, without privilege to do so, shall . . . [k]nowingly enter or remain on the land or premises of another[.]" R.C. 2911.21(A)(1). As noted above, Cherry contends the State failed to prove he acted knowingly. Pursuant to R.C. 2901.22(B),

[a] person acts knowingly, regardless of purpose, when the person is aware that the person's conduct will probably cause a certain result or will probably be of a certain nature. A person has knowledge of circumstances when the person is aware that such circumstances probably exist. When knowledge of the existence of a particular fact is an element of an offense, such knowledge is established if a person subjectively believes that there is a high probability of its existence and fails to make inquiry or acts with a conscious purpose to avoid learning the fact.

R.C. 2901.22(B).

{¶ 34} "Absent a defendant's admission regarding his knowledge, whether a person acts knowingly can only be determined from all the surrounding facts and circumstances, including the doing of the act itself." *Madden*, 2024-Ohio-2851 at ¶ 39. "[T]he state can prove knowledge through either direct or circumstantial evidence." *State v. Jordan*, 2023-Ohio-3800, ¶ 26. Circumstantial evidence is "'proof of facts by direct evidence from which the trier of fact may infer or derive by reasoning other facts.'" *State v. Raleigh*, 2010-Ohio-2966, ¶ 46 (12th Dist.), quoting *State v. Wells*, 2007-Ohio-1362, ¶

11 (12th Dist.).

{¶ 35} On appeal, Cherry does not dispute that he entered an occupied structure or that he possessed a deadly weapon that evening. Instead, Cherry argues that there was insufficient evidence to support his aggravated burglary conviction because the State failed to prove he acted "knowingly" when he entered the Hunsaker Residence. Specifically, Cherry argues the evidence produced at trial established that he mistakenly believed he had entered his friend's house that evening and therefore he did not "knowingly" enter the Hunsaker Residence without privilege to do so. For these same reasons, he argues that the evidence weighed in favor of an acquittal.

{¶ 36} "Mistake of fact is a defense if it negates a mental state required to establish an element of a crime." *In re A.C.D.*, 2015-Ohio-232, ¶ 15 (12th Dist.), citing *State v. Vansickle*, 2014-Ohio-1324, ¶ 24 (12th Dist.). "Mistake of fact is widely recognized as a defense to specific intent crimes when the defendant has an honest purpose and the honest purpose provides an excuse for an act that would otherwise be deemed criminal." *A.C.D.* at ¶ 15. Thus, "mistake of fact can, in an appropriate circumstance, negate a knowing mental state." *Id*. However, a mistake of fact defense fails if the defendant's mistaken belief was not reasonable. *Id*. at ¶ 16.

{¶ 37} Upon our review of the record, we find that Cherry's claimed mistaken belief that the Hunsaker Residence was actually 65 Eleanor Drive was unreasonable under the circumstances of this case. As an initial note, this court addressed a similar fact pattern in *State v. Stockhoff*, 2002-Ohio-1342, ¶ 2-5 (12th Dist.). In that case, the defendant was convicted of burglary after entering his neighbor's home by mistake while intoxicated. *Id*. at ¶ 5. According to the appellant, who lived across the street from his neighbor, he was "only trying to get home" when he kicked in his neighbor's door and entered her home. *Id*. at ¶ 2-3. On appeal, this court rejected the appellant's argument that, due to his

voluntary intoxication that evening, he was unable to form the requisite mental state of "knowingly." *Id*. at ¶ 14. In so doing, we noted that pursuant to R.C. 2901.21(C), "[v]oluntary intoxication may not be taken into consideration in determining the existence of a mental state that is an element of a criminal offense."[3] As such, we found the defense of voluntary intoxication inapplicable to the crime of burglary. *Id*.; *accord State v. Haney*, 2006-Ohio-3899, ¶ 27 (12th Dist.); *State v. K.W.*, 2016-Ohio-7365, ¶ 28 (12th Dist.).

{¶ 38} In this case, Cherry told Detective Hogan that his consumption of illicit drugs on April 1, including marijuana, caused him to black out and left him significantly impaired. As a result, he says he did not know how he got to the Hunsaker Residence and thought he was at a nearby friend's house, 65 Eleanor Drive, when he entered the Hunsaker Residence. Based upon our analysis in *Stockhoff* and R.C. 2901.21(E), even if we assume that Cherry's drug use impacted his ability to distinguish the Hunsaker Residence from his friend's house that evening, we disagree that any such drug use negated his ability to act knowingly. This is because Cherry's "[v]oluntary intoxication may not be taken into consideration in determining the existence of" the necessary mental state to commit aggravated burglary. *Stockhoff* at ¶ 14; R.C. 2901.21(E). As such, Cherry cannot claim, as a matter of law, that his intoxication prevented him from acting knowingly.

{¶ 39} When considering the totality of the evidence presented at trial, the State presented ample evidence that Cherry knowingly entered the Hunsaker Residence without privilege to do so and that any mistake of fact defense was unreasonable. Although Cherry claimed he believed he was entering 65 Eleanor Drive, the trial court was free to disbelieve Cherry's theory of the case. *State v. Milby*, 2013-Ohio-4331, ¶ 37 (12th Dist.) (the trier of fact is entitled to disbelieve the defense's theory of the case). This

---

3. The language in R.C. 2901.21(C) cited in *Stockhoff* is now codified at R.C. 2901.21(E).

is especially true where Cherry offered inconsistent explanations for his actions that evening, the trial court observed Cherry's demeanor on various video recordings, and the State presented significant evidence of the dissimilarities of the two properties. These differences include the homes' positioning on their respective streets, the length of their driveways, the positioning and sizes of their garages, the exterior set-up of the homes, and the overall organization of the homes' interiors and garages. There was also evidence that Cherry entered and exited the Hunsaker Residence undetected by the home's Ring doorbell camera, suggesting he entered and exited the garage in an elusive manner. Based upon this circumstantial evidence, the trial court could have reasonably concluded that Cherry knew he was at the incorrect residence but elected to enter regardless.

{¶ 40} The trial court could have also reasonably concluded that Cherry's behavior inside the Hunsaker Residence did not negate his knowing intent. That is, simply because Cherry could have stolen additional items during his trespass in the Hunsaker Residence, but did not do so, does not excuse his intentional consumption of the Hunsakers' pantry items without permission. Furthermore, even if Cherry did not intend to cause harm or commit a crime when he entered the Hunsaker Residence, it is well settled that, "[f]or purposes of defining the offense of aggravated burglary pursuant to R.C. 2911.11, a defendant may form the purpose to commit a criminal offense at any point during the course of a trespass." *State v. Fontes*, 2000-Ohio-472, ¶ 14 (2000). In this case, the evidence certainly establishes that once inside the home, Cherry decided to take various pantry items and that he did not have permission to take those items. Thus, even if Cherry initially entered the house without any intent to commit a criminal offense, the evidence presented at trial supported the conclusion that he ultimately formed the requisite intent during the trespass. *See State v. Moore*, 2006-Ohio-2800, ¶ 8-9 (12th Dist.). There was sufficient evidence to prove aggravated burglary and the court did not lose its way or

create a manifest miscarriage of justice when it convicted Cherry of aggravated burglary.

### III. Conclusion

{¶ 41} For these reasons, we find that Cherry's conviction for aggravated burglary is supported by sufficient evidence as well as the greater weight of evidence. When considering the totality of the evidence presented at trial, the State presented sufficient credible evidence that Cherry acted knowingly when he entered the Hunsaker Residence on the morning of April 2, 2024, and that his "mistake of fact" defense was unreasonable. Accordingly, finding no merit to any of the arguments raised herein, we overrule Cherry's assignments of error.

{¶ 42} Judgment affirmed.

HENDRICKSON, P.J., and PIPER, J., concur.

## J U D G M E N T   E N T R Y

The assignments of error properly before this court having been ruled upon, it is the order of this court that the judgment or final order appealed from be, and the same hereby is, affirmed.

It is further ordered that a mandate be sent to the Warren County Court of Common Pleas for execution upon this judgment and that a certified copy of this Opinion and Judgment Entry shall constitute the mandate pursuant to App.R. 27.

Costs to be taxed in compliance with App.R. 24.

/s/ Robert A. Hendrickson, Presiding Judge

/s/ Robin N. Piper, Judge

/s/ Matthew R. Byrne, Judge